UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SKYLINE WESLEYAN CHURCH,<br><br>Plaintiff,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF MANAGED HEALTH CARE; MICHELLE ROUILLARD, in her official capacity as Director of the California Department of Managed Health Care,<br><br>Defendants. | Case No.: 3:16-cv-0501-CAB-(DHB)<br><br>**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br>**[Doc. Nos. 67, 68]** |

This matter comes before the Court on Plaintiff's Motion for Summary Judgment [Doc. No. 67] and on Defendants' Cross Motion for Summary Judgment, or in the Alternative for Summary Adjudication, of Claims (or Defenses) [Doc. No. 68]. The motions have been fully briefed and the Court held oral argument on February 26, 2018. For the following reasons, Defendants' motion is granted and Plaintiff's motion is denied.

## BACKGROUND

In California, the Department of Managed Health Care ("DMHC") is one of two state entities charged with overseeing the health coverage market, enforcing California laws and regulating health care service plans. Its responsibilities include ensuring that

1

health care plans in California comply with the Knox-Keene Health Care Service Plan Act by providing "enrollees with access to quality health care services and protect and promote the interests of enrollees." CAL. HEALTH & SAFETY CODE § 1341(a); [Doc. No. 67-6 at 246-248[1]]. Defendant Rouillard is the Director of the DMHC. [Doc. No. 67-6 at 432.]

Plaintiff is a non-profit Christian church located in La Mesa California, organized exclusively for religious purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code. [Doc. No. 67-3 at 7-14.] Skyline Church believes that abortion is a sin and is incompatible with the Bible's teachings. [*Id.* at 2, ¶ 9.] As a member of the Wesleyan denomination, Skyline Church follows and operates in accordance with *The Discipline of the Wesleyan Church*. [*Id.* at 2, ¶ 6.] Thus, it agrees with the Wesleyan Church's position that an abortion is only permissible in:

> rare pregnancies where there are grave medical conditions threatening the life of the mother, which would raise a serious question about taking the life of the unborn child. In such a case, a decision should be made only after very prayerful consideration following medical and spiritual counseling.

[*Id.* at 44.]

On August 22, 2014, Defendant Rouillard sent letters to seven group health plans[2] that had limited or excluded coverage for termination of pregnancies. [Doc. No. 67-9 at 56-57; Doc. No. 68-5 at 8-21.] The letters explained that the "DMHC has reviewed the relevant legal authorities and has concluded that it erroneously approved, or it did not object to such discriminatory language in some evidence of coverage (EOC) filings." [Doc. No. 67-9 at 56-57; Doc. No. 68-5 at 8-21.] Further, the stated purpose of the letters was to:

---

[1] Document numbers and page references are to those assigned by CM/ECF for the docket entry.

[2] The seven plans who were recipients of the letters were: (1) Aetna Health of California, Inc., ("Aetna"); (2) Blue Cross of California ("Blue Cross'); (3) California Physicians' Services, dba Blue Shield of California ("Blue Shield); (4) GEMCare Health Plan, Inc., dba ERD, Inc., Physicians Choice by GEMCare Health Plan ("GEMCare"); (5) Health Net of California ("Health Net"); (6) Kaiser Foundation Health Plan, Inc., dba Kaiser Foundation. Permanente Medical Care Program ("Kaiser'); and (7) UHC of California ("UHC").

> remind plans that the Knox-Keene Health Care Service Plan Act of 1971 (Knox Keene Act) requires the provision of basic health care services and the California Constitution prohibits health plans from discriminating against women who choose to terminate a pregnancy. Thus, all health plans must treat maternity services and legal abortion neutrally.
> Exclusions and limitations are also incompatible with both the California Reproductive Privacy Act and multiple California judicial decisions that have unambiguously established under the California Constitution that every pregnant woman has the fundamental right to choose to either bear a child or have a legal abortion. A health plan is not required to cover abortions that would be unlawful under Health & Safety Code § 123468.

[Doc. No. 67-9 at 56; Doc. No. 68-5 at 8, 10, 12, 14, 16, 18, 20.][3] The letter informed the issuers of the health care plans that the plans must be amended to "remove discriminatory coverage exclusions and limitations," including but not limited to, "any exclusion of coverage for "voluntary" or "elective" abortions and/or any limitations of coverage to only "therapeutic" or "medically necessary" abortions." [Doc. No. 67-9 at 57; Doc. No. 68-5 at 9, 11, 13, 15, 17, 19, 21.] Upon receipt of the letters all of the issuers amended their health plan filings to eliminate the abortion exclusions. [Doc. No. 78-3 at 156.]

Before August 22, 2014, Skyline Church had an employee health plan that restricted abortion coverage consistent with the Church's religious beliefs. [Doc. No. 67-6 at 45-46, 132-33.] On September 3, 2014, Aetna, Skyline Church's health insurance provider at the time, responded to the DMHC's letter by removing reference to voluntary termination of pregnancy exclusions. [Doc. No. 67-9 at 63-64.]

In October of 2014 and 2016, Skyline Church contacted its insurance broker, Mr. Himmer, to discuss the possibility of obtaining a religious exemption from the abortion coverage requirement and purchasing a plan that restricted abortion coverage consistent

---

[3] A footnote indicates that "[a]lthough health plans are required to cover legal abortions, no individual health care provider, religiously sponsored health carrier, or health care facility may be required by law or contract in any circumstances to participate in the provision of or payment for a specific service if they object to doing so for reasons of conscience or religion. [Doc. No. 67-9, fn. 3 at 56; Doc No. 68-5 fn. 3 at 8, 10, 12, 14, 16, 18, 20.]

with the Church's religious beliefs. [Doc. No. 67-4 at 2, ¶¶4-5; Doc. No. 67-6 at 50, 130-133, 186-188.] Mr. Himmer informed the Church that all of the available employee health care plans were required to provide coverage for elective abortion. [Doc. No. 67-4 at 2, ¶¶4, 5; Doc. No. 67-6 135-136, 186-187.] Daniel Grant, the executive pastor and chief financial officer of Skyline Church, did not make inquiries with any other churches as to the medical care plans they subscribe to and saw no reason "to try and seek out any other insurance because it would have been against the law to have any insurance that didn't cover" abortion but did contemplate joining a medical sharing ministry and self-insurance. [Doc. No. 67-6 at 83-84, 135-139.]

Subsequently, the DMHC informed the health care plans that it would grant them an exemption from the requirements it had detailed in the August 22, 2014 letter for products offered exclusively to entities that meet the definition of a "religious employers" as defined in the California Health and Safety Code 1367.25(b)(1). [Doc. No. 67-6 at 360-367; Doc. No. 68-5 at 31.] DMHC also allowed Anthem Blue Cross to offer a plan to religious employers which limits termination of pregnancy to situations involving rape, incest or where the woman's life is in danger. [Doc. No. 67-1 at 6-35; Doc. No. 67-6 at 359-368; Doc. No. 67-6 at 477; Doc. No. 68-5 at 5 ¶ 5; Doc. No. 78-3 at 156.] A declaration from Sarah Ream, the Deputy Director of the Office of Plan Licensing at the DMHC, executed on November 15, 2017, attests "[t]o date, no plan has requested an exemption that would mandate that women who become pregnant as a result of rape or incest be forced to carry to term." [Doc. No. 68-4 at ¶ 2.]

On February 4, 2016, Plaintiff filed a complaint for declaratory and injunctive relief and nominal damages in San Diego County Superior Court against Defendants, alleging claims for (1) violation of the Free Exercise Clause of the First Amendment of the United States Constitution; (2) violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution; (3) violation of the Establishment Clause of the First Amendment of the United States Constitution; (4) violation of the Establishment and Free Exercise Clauses of Article I, Section 4 of the California Constitution; (5)

violation of the Equal Protection Clause of Article I, Section 7 of the California Constitution; and (6) violation of the California Administrative Procedure Act ("APA"), California Government Code § 11340, *et seq*. [Doc. No. 1 at 9-29.] Plaintiff alleges that it wishes to provide health coverage to its employees in a way that "does not cause it to pay for abortions" and that participating in or paying for a plan that provides for abortions in circumstances not limited to endangering the mother's life, is inconsistent with its beliefs and is a grave sin. [*Id.* ¶¶ 23, 29.] On June 20, 2016, the Honorable Marilyn L. Huff, granted Defendants' motion to dismiss Plaintiff's equal protection claims and denied their motion to dismiss Plaintiff's remaining claims. [Doc. No. 28.]

On November 11, 2017, the parties filed their cross motions for summary judgment. [Doc. Nos. 67, 68] Plaintiff seeks judgment in its favor on the free exercise claims, establishment clause claims and APA claims. [Doc. No. 67] In support, Plaintiff asserts that the undisputed facts show Defendants have substantially burdened the Church's religious beliefs and interfered with its ability to conduct its internal affairs consistent with its religious beliefs about abortion. Further, Plaintiff contends that after issuing that abortion coverage requirement Defendants exercised their discretionary exemption authority in a way that prefers some religious beliefs over others. Finally, Plaintiff posits that Defendants' new interpretation of the Knox-Keene Act conflicts with existing state and federal law.

Defendants contest Plaintiff's Article III standing to bring this suit, asserting that: (1) Plaintiff cannot demonstrate an injury in fact; (2) the alleged injury is not traceable to Defendants; and (3) the alleged injury would not be addressable by a favorable decision. Defendants also contend that Plaintiff has neither demonstrated a Constitutional nor APA violation. [Doc. No. 68.] Since the cross motions for summary judgment request

adjudication of the same issues and contain arguments common to both, the Court will address the motions together.[4]

## DISCUSSION

### I. Legal Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any , show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Entry of summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "When parties submit cross-motions for summary judgment, '[e]ach motion must be considered on its own merits." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quotations and citations omitted). If the cross-motions are before the court at the same time, the court is obliged to consider the evidence proffered by both sets of motions before ruling on either one. *Id.* at 1134.

### II. Ripeness of Plaintiff's Claims

Defendants' standing arguments raise a ripeness question that compels discussion.[5] "Ripeness is a justiciability doctrine designed to prevent the courts through avoidance of premature adjudication, from entangling themselves in abstract disagreements over

---

[4] Ordinarily, Judge Bencivengo does not require the parties to file a Separate Statement of Material Facts. *See* Judge Bencivengo's Civil Case Procedures, II.C. ("Notwithstanding Civ.L.R. 7.1.f.1, Separate Statements of Fact shall **NOT** be filed.") However, the motion was filed when this case was pending before Judge Huff, who does not have any specific chambers rules governing Statements of Facts. Accordingly, Defendants' Motion for Leave to File Separate Statement of Material Facts in Support of Defendants' Motion for Summary Judgment, or in the Alternative for Summary Adjudication of Claims (or Defenses) [Doc. No. 71] is **GRANTED**.

[5] *See Reno v. Catholic Soc. Servs., Inc.,* 509 U.S. 43, 57 n.18 (1993) ("Even when a ripeness question in a particular case is prudential" the court "may raise it on [its] own motion and 'cannot be bound by the wishes of the parties.'") (citing *Reg'l Rail Reorganization Act Cases,* 419 U.S. 102, 138 (1974))

administrative polices, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) *(*quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967)). The doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Id. See also Portman v. Cnty. of Santa Clara,* 995 F.2d 898, 902 (9th Cir. 1993). ("The ripeness inquiry contains both a constitutional and a prudential component."). "If a case is not ripe for review, then there is no case or controversy, and the court lacks subject-matter jurisdiction." *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 669 (9th Cir. 2005). "A claim is not ripe for adjudication if it rests upon contingent future events that may occur as anticipated, or indeed may not occur at all." *Texas v. U.S.*, 523 U.S. 296, 300 (1998) (internal quotation marks and citation omitted).

   a. **Constitutional Component**

Constitutional ripeness requires that prior to a court exercising its jurisdiction "there exist a constitutional 'case or controversy,' that the issues presented are 'definite and concrete, not hypothetical or abstract.'" *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc) (quoting *Ry. Mail Ass'n v. Corsi*, 326 U.S. 88, 93 (1945)). "The constitutional component of ripeness overlaps with the 'injury in fact' analysis for Article III standing." *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010). Regardless of how it is framed, "the inquiry is largely the same: whether the issues presented are 'definite and concrete, not hypothetical or abstract." *Id.* at 1058 (quoting *Thomas*, 220 F.3d at 1139). The court must consider "whether the plaintiffs face a realistic danger of sustaining a direct injury as a result of defendants' allegedly illegal action or whether the alleged injury is too imaginary or speculative to support jurisdiction." *Thomas,* 220 F.3d at 1139 (internal quotation marks and citation omitted). Therefore, when a plaintiff challenges a statute's constitutionality "neither the mere existence of a proscriptive

statute nor a generalized threat of prosecution satisfies the 'case or controversy' requirement." *Id.*

Plaintiff argues that this case became ripe when Aetna, Plaintiff's health insurance provider in 2014, responded to the August 22, 2014 letter from the DMHC and removed reference to voluntary termination of pregnancy exclusions. Prior to August 22, 2014, Skyline Church had an employee health plan that restricted abortion coverage consistent with the Church's religious beliefs. [Doc. No. 67-6 at 45-46, 132-33.] While it might be true that Plaintiff was injured as a result of the change to its health care plan, Plaintiff overlooks the subsequent position adopted by DMHC. Since issuing the August 22, 2014 letter, the DMHC has allowed health care plans to offer religious employers plans limiting termination of pregnancy to situations involving rape, incest or where the woman's life is in danger. This intervening event means that Plaintiff's inability to obtain approval of a desirable health care plan is far from certain.

If the Court were to allow Plaintiff to proceed with this case, the Court would be hypothesizing that (1) a health care insurance company will offer a plan to Plaintiff with the exemption it requires; (2) the plan will apply to the DMHC for approval, and (3) the DMHC will not approve the plan. These circumstances are in stark contrast to those facing the Ninth Circuit in *Oklevueha*,[6] are too abstract and hypothetical, and rely on Plaintiff's

---

[6] At the hearing, in an attempt to overcome the Court's concerns regarding the ripeness of this controversy, Plaintiff relied on *Oklevueha Native American Church of Hawaii, Inv. v. Holder*, 676 F.3d 829 (9th Cir. 2012). But, Plaintiff's reliance is misplaced. In *Oklevueha,* the Ninth Circuit held that when challenging the applicability of a criminal statute, arrest is not necessarily a prerequisite for an individual to bring a pre-enforcement claim. *Id.* at 835; *see also Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298 (1979) ("When the Plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await a criminal prosecution as the sole means of seeking relief.") (internal quotation marks omitted). In so holding, the Court of Appeals found that because the Controlled Substance Act had already been enforced against plaintiffs through the seizure of marijuana the case was "not the kind of 'abstract disagreement' that the ripeness doctrine prevents courts from adjudicating. Plaintiffs' stake in the legal issues is concrete rather than abstract." *Oklevueha*, 676 F.3d at 837. Further, the Ninth Circuit found that under prudential grounds the claims at issue arose from an enforcement action that has already occurred and presented a "concrete factual scenario that demonstrates how the laws, as
8

3:16-cv-0501-CAB-(DHB)

contention that DMHC denial of its desired plan is a foregone conclusion. *See In re Coleman,* 560 F.3d 1000, 1005 (9th Cir. 2009) ("Where a dispute hangs on future contingencies that may or may not occur . . . it may be too impermissibly speculative to present a justiciable controversy."); *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 186 (1985) (finding that plaintiff's claim was not ripe for determination because "respondent has not yet obtained a final decision regarding the application of the zoning ordinance."). While the decision to require health care plans to remove discriminatory coverage and exclusions related to voluntary and elective abortions may well be a definitive and final decision on the part of the DMHC, the decision regarding the types of exemptions to confer religious employers is far from settled. If the DMHC were to receive and approve a plan that met Plaintiff's requirements, this litigation would be unnecessary and any potential infringements on Plaintiff's religious beliefs would cease to exist. Until the DMHC receives and denies approval of a health care plan that reflects Plaintiff's religious beliefs, the Court concludes that Plaintiff's claims do not present a constitutionally ripe case or controversy. *See, e.g., Gutay Christian Fellowship v. Cnty. of San Diego,* 670 F.3d 957, 980 (9th Cir. 2011) (concluding that Plaintiff's failure to complete even one application left the court unable to discern whether there was a true case in controversy and any resulting injury).

### b. Prudential Component

Even if the Court were to conclude that Plaintiff presents a ripe case or controversy in the constitutional sense, the Court would decline to exercise jurisdiction under the

---

applied, infringe [Plaintiff's constitutional rights." *Id.* quoting *Thomas,* 220 F.3d at 1141. These are not the circumstances currently facing the Court

Here, none of the requisite components of a pre-enforcement claim have been met, and nothing in the Oklevueha court's reasoning suggests that in a civil action brought by a plaintiff challenging an agency's administrative decision the plaintiff need not first apply to the agency for relief. Although, the *Oklevueha* court concluded that plaintiffs did not need to seek an exception to the CSA from the DEA it did so because it declined "to read an exhaustion requirement into [the Religious Freedom Restoration Act] where the statute contains no such condition [] and the Supreme Court has not imposed one." *Oklevueha,* 676 F.3d at 838.

prudential component of the ripeness doctrine. Prudential review requires the court to consider whether an administrative decision is ripe for judicial review by evaluating "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hospitality Ass'n,* 538 U.S. at 808. *See also Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 891 (1990) ("a regulation is not ordinarily considered the type of agency action "ripe" for judicial review [] until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him."). A claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *US West Commc'ns v. MFS Intelenet, Inc.,* 193 F.3d 1112, 1118 (9th Cir. 1999). *See also Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 733 (1998) (in evaluating the "fitness of the issues for judicial review," courts consider whether judicial intervention would cause undue hardship to the plaintiff, "whether judicial intervention would inappropriately interfere with further administrative action," and whether the courts would benefit from further factual development on the issues.); *Addington v. U.S. Airline Pilots Ass'n,* 606 F.3d 1174 (9th Cir. 2010) (an issue is fit for judicial review when it "can be decided without considering contingent events that may or may not occur as anticipated, or indeed may not occur at all.").

Here, the evidentiary record makes it abundantly clear that no health plan has approached the DMHC seeking an exemption that would satisfy Plaintiff's beliefs. This conclusion is supported by the declaration of Sarah Ream, the Deputy Director of the Office of Plan Licensing who attested that "no plan has requested an exemption that would mandate that women who become pregnant as a result of rape or incest be forced to carry to term," [Doc. No. 68-4 at ¶ 2], and the deposition testimony submitted by the parties in support of their motions. At the hearing, Plaintiff's counsel did not dispute this fact, instead he choose to argue that it was reasonable for the health plans to not go back and ask the Department for an exemption. The Court disagrees, especially in light of the DMHC's

subsequent decision to allow BCBS to offer religious employers a plan with an exemption in October 2015.

Further, the Court finds no health care plan has actually been asked to provide Plaintiff with a policy that contains its desired abortion limitations. Plaintiff's position that it went to other insurer health plans and asked for a plan with its desired exemption is not borne out by the record before the Court. Rather, the evidentiary record demonstrates that Plaintiff via Mr. Himmer, communicated with one health insurer and with California Choice, a private health insurance exchange, in generalized terms about health care plans in California being required to cover elective abortions. In the Fall of 2014, Mr. Himmer, communicated with Aetna regarding religious employers providing coverage for elective abortions and was informed that: (1) Aetna did not believe that religious organizations were exempt; (2) Aetna's legal department had determined that it did not offer plan that excluded elective abortions; and (3) Aetna's plans included elective abortion coverage that it could not take out. [Doc. No. 67-4 at 9-10.] Nothing in the record illustrates that Plaintiff made any subsequent inquiries to Aetna after DMHC informed health care plans it would grant religious exemptions. As to California Choice, the communications between Mr. Himmer and Mark Mattingley, Broker Administrator, CHOICE Administrators were brief and generalized. In October 2014, Mr. Mattingley, Broker Administrator, CHOICE Administrators, emailed a pdf of an Anthem Plan to Mr. Himmer writing that, as far as he was concerned, "[i]f [the DMHC August 22, 2104 letter] is a law, our carriers are in compliance." [*Id.* at 5-7.] In October 2016, Mr. Himmer sent a subsequent email inquiry to Mr. Mattingley posing the question "[d]o any of the health insurance options available NOT cover elective abortions." [*Id.* at 13-14.] Mr. Mattingley's response reflect his understanding that the new law required all plans in California to cover elective abortions and that California Choice did not have a way to limit plans. [*Id.*] This evidence does not demonstrate that any plan was directly asked if it would be willing to provided Plaintiff with a plan containing its desired exemption. Moreover, it does not appear that Mr. Himmer contacted any other plans or the DMHC before reporting to Plaintiff that all of the

available employee health care plans are required to provide coverage for elective abortion. [Doc. No. 67-4 at 2, ¶¶4, 5; Doc. No. 67-6 at 135-136, 186-187.]

Notably, Plaintiff has not communicated directly with the DMHC regarding its desired exemption, choosing instead to discuss its requirements with is its insurance broker and to file a lawsuit. [Doc. No. 67-4 at 2, ¶¶4-5; Doc. No. 67-6 at 50, 130-133, 186-188.] Neither has Plaintiff aligned itself with a provider and submitted a proposed plan to the DMHC. When asked about this during the hearing, Plaintiff's counsel argued that communicating with the DMHC directly regarding the health care plan it wants, or even submitting a proposed health care plan, was not necessary as the Department "knows what Plaintiff wants" because Plaintiff had filed the complaint. Counsel also inferred that the Court should view Defendants' failure to find and offer a health care plan to Plaintiff that comported with its religious beliefs as evidence of Defendants' unwillingness to approve a health care plan containing Plaintiff's exemption. However, DMHC has never been provided with an actual plan, and the Court finds nothing untoward in the Department's unwillingness to blindly agree to approve a health care plan that it has not seen. Furthermore, Plaintiff's suggestion that it was Defendants' responsibility to go out and find it a plan that comports with its religious beliefs misunderstands the role of the DMHC in the health care arena and is equally unavailing. The Court is not persuaded by these arguments and finds nothing in Defendants' behavior that could be interpreted as being tantamount to a denial of approval of a health plan containing the requisite exemption. At bottom, what is missing here, is a final decision from the DMHC on a health care plan that meets Plaintiff's religious exemption requirements.

Neither has it been demonstrated that should a health care plan apply for such an exemption, Defendants would deny it or that such an application would be futile. Contrary to Plaintiff's counsel's position at the hearing, the revocations of the earlier exemptions awarded to religious employers in the past [Doc. Nos. 67-10 at 1 "Exhibit 24"; 60 "Exhibit

28", 69 "Exhibit 42"; 76 "Exhibit 45"][7] do not provide a reasonable justification for why health care plans should not apply for a subsequent exemption. In fact, at her deposition Defendant Rouillard left open the possibility of allowing an exemption as desired by Plaintiff, if a plan was to apply for one. [Doc. No. 67-6 at 475-478.] Moreover, following the issuance of the August 22, 2014 letters, the DMHC informed the health care plans that it would grant them an exemption from the requirements of offering voluntary and elective abortions to religious employers and allowed Anthem Blue Cross to offer religious employers a plan that limits abortion to situations involving rape, incest or where the woman's life is in danger. [Doc. Nos. 67-1 at 6-35; Doc. No. 67-6 at 359 -368, 477; Doc. No. 68-5 at 5 ¶ 5, 31; Doc. No. 78-3 at 156.]

It is inescapable that, without being given a plan to review, Defendants were denied the opportunity to evaluate and respond to the Plaintiff's desired exemption. Had Plaintiff made a request for approval of a health care plan with its desired exemption, and had the DHMC denied the request, Plaintiff's claims would certainly be ripe, but that is not the circumstances confronting the Court. At this point in time it cannot be said that the DMHC would deny a health care plan's request to offer the exemption sought by Plaintiff because no such plan has been submitted. Thus, the existence of a controversy depends on a factual scenario that may or may not materialize, making this case unfit for review.

As to the hardship inquiry, there is no evidence before the Court to demonstrate that deferral of review of Plaintiff's claims will result in real hardship. When determining if a litigant has demonstrated hardship, a court considers "whether the regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance." *Stormans, Inc. v. Selecky,* 568 F.3d 1109, 1126 (9th Cir. 2009) (internal quotation marks and citation omitted). Here, the potential hardship of funding a health care plan that offers abortions in situations that conflict with the religious

---

[7] At the hearing counsel referred to these documents using the lodged sealed docket numbers, 70-1 – 70-5. Having declined the motion to seal, the Court refers to the original document numbers.

beliefs held by Skyline Church is ameliorated by the Church's ability to seek alternative forms of health insurance for its employees. Although Plaintiff's counsel stated at oral argument that it cannot go anywhere else to satisfy its insurance needs because there are no alternative ways to secure its desired plan, this position is not supported by the record. To the contrary, the deposition transcripts provide testimony that other insurance, such as a non-regulated DMHC plan, a medical sharing ministries plan or self-insurance, could be purchased, but at a higher cost. [Doc. No. 67-6 at 36-39, 48-49, 136-138, 207-08.] Direct and immediate hardship must entail more that possible financial loss." *Stormans, Inc.,* 586 F.3d at 1126 (quoting *US West Commc'ns,* 193 F.3d at 1118). Moreover, Plaintiff's other hardship argument, premised on the burdensome nature of changing insurance plans, is negated by Defendants' contention that Plaintiff has changed health care plans three times since the August 22, 2014 letter was issued. [Doc. No. 67-6 at 180-181.] Thus, the Court concludes that Plaintiff has not demonstrated that delaying determination on this issue until it becomes ripe would cause irreparable hardship, and therefore, its claims are not prudentially ripe for reconsideration.

### c. Standing

Next, the Court addresses a standing issue related to Plaintiff's claims. Assuming that Plaintiff has satisfied the first and second conditions necessary for Article III standing, the Court does not believe that the injury complained of is redressable by a favorable decision.

Article III standing requires that: "(1) at least one named plaintiff suffered an injury in fact, (2) the injury is fairly traceable to the challenged conduct, and (3) the injury is likely to be redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61 (quotation marks and citation omitted).[8] When a lawsuit "challenges the legality of government action, and the plaintiff has been the object of that action, then it is presumed that a judgment

---

[8] As the party invoking federal jurisdiction, Plaintiff bears the burden of establishing these elements. *Spokeo, Inc., v. Robins*, 136 S. Ct. 1540, 1547 (2016).

14

preventing the action will redress his injury. *Mayfield v. U.S.,* 599 F.3d 964, 971 (9th Cir. 2010) (citing *Lujan*, 504 U.S. at 561-62.) However, because a plaintiff must demonstrate standing separately for each form of relief sought, a plaintiff who has standing to seek damages for a past injury, or injunctive relief for an ongoing injury, does not necessarily have standing to seek prospective relief such as a declaratory judgment. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Serv., Inc.,* 528 U.S. 167, 185-86 (2000). To establish standing, Plaintiff must show a substantial likelihood that the relief sought would address the injury. *See Johnson v. Stuart*, 702 F.2d 193, 196 (9th Cir. 1983).

Here, Plaintiff has not demonstrated a substantial likelihood that the relief it seeks will redress the alleged injury. As defense counsel pointed out at the hearing, the DMHC cannot order or force a health care plan to create or offer a plan that satisfies Plaintiff's needs, and it cannot create the plan itself. It is up to the individual health care plan to draft a plan that meets the needs of its purchasers and then submit it to the DMHC for approval. Plaintiff's counsel's argument that an order from the Court that the DMHC had to provide an exclusion to a health care plan would make it substantial more likely that the church's injury be redressed does not assuage the Court's concerns regarding the redressability of its claims. Without a declaration from a health care plan attesting to such, the Court is unwilling to make such a presumption.

Since not a single health care plan is a party to this case, any relief the Court could accord would only be against the DMHC: a Department that does not provide health care plans and is simply a regulatory body that does not have the authority to mandate that a provider give Plaintiff the plan it seek. Assuming the Court would order the DMHC to approve a plan containing Plaintiff's desired exception, this would not remedy Plaintiff's alleged injury. Redress of the complained of injury requires action by a non-party health care plan in the form of furnishing Plaintiff with a plan containing the exemption it desires before approval from the DMHC would issue. But, any relief the Court could provide would not necessitate this action. *See,, e.g., Glanton ex rel. Alcoa Prescription Drug Plan v. AdvancePCS, Inc.* 465 F.3d 1123 (9th Cir. 2006) ("any prospective benefits depend on

an independent actor who retains broad and legitimate discretion the courts cannot presume either to control or predict."). Because redressability depends upon the actions of a health care plan in response to the Court's judgment and such actions are not within the control of the Court, Plaintiff lacks standing to pursue its claims.

//

## CONCLUSION

In accordance with the above, Plaintiff's claims are **DISMISSED WITHOUT PREJUDICE**.[9]

It is **SO ORDERED**.

Dated: March 9, 2018

Hon. Cathy Ann Bencivengo
United States District Judge

---

[9] Having reviewed the documents Plaintiff requests be filed under seal, the Court concludes that the documents do not meet the standards required for sealing documents related to dispositive motions. *See* Judge Bencivengo's Civil Case Procedures, V. Accordingly, the Application to File Under Seal [Doc. No. 69] is **DENIED.** The Clerk of the Court will publicly file exhibits 24, 27, 38, 42, 45, and Plaintiff's Separate Statement of Undisputed Facts lodged under seal at Docket Number 70.

Further, having not considered the documents Defendants request the Court take judicial notice of, the pending Request for Judicial Notice in Support of Defendants' Motion for Summary Judgment, or in the Alternative for Summary Adjudication, of Claims (or Defenses) is **DENIED** as **MOOT.** Additionally, having not reached the merits of the parties' arguments, the pending Motion to Exclude Plaintiff's Expert's Testimony and Report [Doc. No. 77] is also **DENIED** as **MOOT.**

Finally, finding no compelling reason to have any portion of Plaintiff's Opposition to Defendant's Motion for Summary Judgment redacted, the Court orders that a non-redacted version of the opposition be publicly filed. The Court has also reviewed the exhibit being cited as the reason for the sealing and concludes that it does not meet the standards necessary to file a document related to a dispositive motion under seal. Accordingly, the Application to File Under Seal [Doc. No. 75] is **DENIED**.