**FILED**

Aug 19 2020

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY    s/ AKR      DEPUTY

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

JUL 29 2020

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| SKYLINE WESLEYAN CHURCH,<br><br>        Plaintiff - Appellant,<br><br>  v.<br><br>CALIFORNIA DEPARTMENT OF<br>MANAGED HEALTH CARE and<br>MICHELLE ROUILLARD, in her<br>official capacity as Director of the<br>California Department of Managed<br>Health Care,<br><br>        Defendants - Appellees. | No. 18-55451<br><br>D.C. No. 3:16-cv-00501-CAB-DHB<br>U.S. District Court for Southern<br>California, San Diego<br><br>**MANDATE** |

The judgment of this Court, entered May 13, 2020, amended July 21, 2020,

takes effect this date.

This constitutes the formal mandate of this Court issued pursuant to Rule

41(a) of the Federal Rules of Appellate Procedure.

Costs are taxed against the appellee in the amount of $292.90.

FOR THE COURT:

MOLLY C. DWYER
CLERK OF COURT

By: Rebecca Lopez
Deputy Clerk
Ninth Circuit Rule 27-7

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SKYLINE WESLEYAN CHURCH, *Plaintiff-Appellant*, | No. 18-55451 |
| | D.C. No. 3:16-cv-00501-CAB-DHB |
| v. | |
| CALIFORNIA DEPARTMENT OF MANAGED HEALTH CARE; MICHELLE ROUILLARD, in her official capacity as Director of the California Department of Managed Health Care, | ORDER AND AMENDED OPINION |
| *Defendants-Appellees.* | |

Appeal from the United States District Court
for the Southern District of California
Cathy Ann Bencivengo, District Judge, Presiding

Argued and Submitted November 4, 2019
Pasadena, California

Filed May 13, 2020
Amended July 21, 2020

Before:  Mary M. Schroeder and Michelle T. Friedland,
Circuit Judges, and Lee H. Rosenthal,[*] District Judge.

Order;
Opinion by Judge Friedland

---

## SUMMARY[**]

---

### Civil Rights

The panel reversed the district court's ruling that it lacked jurisdiction over plaintiff's federal free exercise of religion claim, vacated the district court's ruling that it lacked jurisdiction over plaintiff's other claims, and remanded for further proceedings.

In 2014, the California Department of Managed Health Care and its Director (collectively, the "DMHC") issued letters to seven health insurers directing them that, effective immediately, their insurance plans had to include coverage for legal abortion. The DMHC had determined that its prior practice of permitting the insurers to offer health plans with some abortion-related restrictions was not consistent with California statutory and constitutional law, which provides that legal abortion is a basic health care service that must be offered.  Skyline Wesleyan Church, whose members believe that abortion is impermissible except possibly when the life

---

[*] The Honorable Lee H. Rosenthal, Chief United States District Judge for the Southern District of Texas, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

of the pregnant woman is at risk, filed suit alleging, among other things, that its right to the free exercise of religion required the DMHC to approve a health insurance plan that comported with Skyline's religious beliefs about abortion. The district court dismissed the case, reasoning that jurisdiction was lacking because (1) any injury Skyline had suffered could not be redressed by a court order directed at the DMHC; and (2) any controversy was not ripe because the DMHC had not yet received a request for approval of an insurance plan that would be consistent with Skyline's religious beliefs.

The panel first held that Skyline had established each of the three elements of standing with respect to its federal free exercise claim and, relatedly, that this claim was constitutionally ripe. The panel held that Skyline had suffered an injury in fact, noting that before the letters were sent, Skyline had insurance that excluded abortion coverage in a way that was consistent with its religious beliefs. After the letters were sent, Skyline did not have that coverage, and it had presented evidence that its new coverage violated its religious beliefs. The panel further held that there was a direct chain of causation from the DMHC's directive requiring seven insurers to change their coverage, to Skyline's insurer's doing so, to Skyline's losing access to the type of coverage it wanted.

Addressing redressability, the panel noted, as an initial matter, that Skyline requested nominal damages in its complaint. Nominal damages would redress Skyline's injury, even if only to a minimal extent. The panel further concluded that Skyline's other requested forms of relief—a declaration that the coverage requirement violated its rights under the Free Exercise Clause and a permanent injunction—would likely provide Skyline redress.

The panel held that Skyline's free exercise claim was prudentially ripe. After the DMHC formalized the abortion coverage requirement, there was an immediate effect upon Skyline: its insurer promptly amended Skyline's plan. The panel held that Skyline's challenge to the coverage requirement was fit for decision now and that Skyline did not need to first seek an exemption from the coverage requirement because the enforcement of that requirement had already caused injury.

The panel stated that aspects of its discussion of the justiciability of the free exercise claim may apply equally to Skyline's other claims, but the parties had only briefed the merits of the federal free exercise claim on appeal. The panel vacated the district court's ruling that the other claims were not justiciable and remanded to the district court to reassess the justiciability of Skyline's remaining claims in light of the panel's decision.

The panel declined to exercise its equitable discretion to reach the merits of Skyline's federal free exercise claim. The panel noted that after oral argument, the Supreme Court granted a petition for a writ of certiorari in which one of the questions presented was whether *Employment Division v. Smith*, 494 U.S. 872 (1990), should be revisited. Skyline's free exercise claim turned on the application of *Smith* and later caselaw implementing its holding. Rather than waiting to decide the appeal until after the Supreme Court's decision, the panel remanded for the district court to determine, after resolving whether Skyline's other claims were justiciable, when it would be appropriate to proceed on the merits of Skyline's claims for which there was jurisdiction.

## COUNSEL

Jeremiah J. Galus (argued), Kristen K. Waggoner, and Erik W. Stanley, Alliance Defending Freedom, Scottsdale, Arizona; John J. Bursch, David A. Cortman, and Christiana Holcomb, Alliance Defending Freedom, Washington, D.C.; Charles S. LiMandri, Freedom of Conscience Defense Fund, Rancho Santa Fe, California; for Plaintiff-Appellant.

Karli Eisenberg (argued), Deputy Attorney General; Niromi W. Pfeiffer, Supervising Deputy Attorney General; Julie Weng-Gutierrez and Cheryl L. Feiner, Senior Assistant Attorneys General; Xavier Becerra, Attorney General; Office of the Attorney General, Sacramento, California; for Defendants-Appellees.

Tyler R. Andrews, San Clemente, California, for Amici Curiae The Jewish Coalition for Religious Liberty and The Ethics & Religious Liberty Commission.

## ORDER

Appellees' Petition for Panel Rehearing is **GRANTED IN PART**. The opinion filed on May 13, 2020, reported at 959 F.3d 341, is amended as follows.

On page 352, replace <applied to Skyline> with <applied to prevent approval of a health plan for Skyline that comports with Skyline's religious beliefs>.

On page 353, replace <an order requiring the DMHC to exempt Skyline from the Coverage Requirement> with <relief that would ensure that the Coverage Requirement

does not affect Skyline's ability to obtain a health plan that comports with its beliefs>.

On page 355, replace <the Coverage Requirement's application to Skyline> with <whether it would approve a Skyline-tailored insurance plan>.

On page 355, replace <seek an exemption> with <make further attempts to persuade the DMHC to create an exemption>.

No further petitions for panel rehearing or rehearing en banc will be entertained.

## OPINION

FRIEDLAND, Circuit Judge:

The California Department of Managed Health Care and its director (collectively, the "DMHC") regulate most of the state's commercial health insurance market, including by determining what coverage insurers must provide. In the wake of publicity regarding DMHC-approved insurance plans that limited or excluded coverage for legal abortion, the DMHC analyzed whether restrictions like those were consistent with California statutory and constitutional law. The DMHC concluded that, under California law, legal abortion is a basic health care service that must be offered. The DMHC determined, however, that it had erroneously allowed seven insurers to offer plans with some abortion-related restrictions. In 2014, the DMHC issued a directive informing those seven insurers that, effective immediately, their plans had to include abortion coverage. Although the directive did not provide for any exceptions, the DMHC

agreed in 2015 to allow one insurer to offer a plan to religious employers that would exclude abortion coverage except when the pregnancy was the result of rape or incest or the life of the pregnant woman was threatened.

Members of the Skyline Wesleyan Church share the religious belief that abortion is impermissible except possibly when the life of the pregnant woman is at risk. Until 2014, Skyline had obtained health insurance for its employees via an insurance plan that restricted abortion coverage consistent with that belief. Since the DMHC's directive, however, none of the plans available to Skyline have been comparable.

In 2016, Skyline sued the DMHC. Skyline claims, among other things, that its right to the free exercise of religion requires the DMHC to approve a health insurance plan that comports with Skyline's religious beliefs about abortion. The district court dismissed the case, reasoning that jurisdiction was lacking because (1) any injury Skyline had suffered could not be redressed by a court order directed at the DMHC, and (2) any controversy was not ripe because the DMHC had not yet received a request for approval of an insurance plan that would be consistent with Skyline's religious beliefs. Skyline appealed.

We hold that Skyline's claim under the Free Exercise Clause of the First Amendment is justiciable. But we decline to exercise our discretion to reach the merits in the first instance and therefore remand to the district court for further proceedings.

# I.

## A.

The Knox-Keene Health Care Service Plan Act of 1975, Cal. Health & Safety Code § 1340 *et seq.*, provides the legal framework for California's regulation of health maintenance organizations (HMOs) and managed care organizations (MCOs). *Rea v. Blue Shield of Cal.*, 172 Cal. Rptr. 3d 823, 827 (Ct. App. 2014). Regulated insurers must obtain a license from the DMHC to engage in business in the state. *See* Cal. Health & Safety Code § 1349. As of early 2015, there were more than 20 million enrollees in DMHC-regulated health insurance plans, accounting for most insurance enrollees in California.

The Knox-Keene Act tasks the DMHC with ensuring access to quality care for enrollees. *Id.* § 1341(a). Covered health plans are generally required to provide their members with all "basic health care services." *Id.* § 1367(i). The Knox-Keene Act includes a seven-item statutory definition of "basic health care services," *see id.* § 1345(b),[1] which the

---

[1] The statute defines "basic health care services" as:

    (1)  Physician services, including consultation and referral.

    (2)  Hospital inpatient services and ambulatory care services.

    (3)  Diagnostic laboratory and diagnostic and therapeutic radiologic services.

    (4)  Home health services.

DMHC has further fleshed out by regulation, *see* Cal. Code Regs. tit. 28, § 1300.67.

The Knox-Keene Act vests the DMHC director with discretion to, "for good cause, by rule or order exempt a plan contract or any class of plan contracts" from the requirement of providing all "basic health care services." Cal. Health & Safety Code § 1367(i). The DMHC director also has the authority to adopt rules or issue orders exempting, for example, otherwise covered insurers from the entirety of the Knox-Keene Act. *Id.* § 1343(b); *see also id.* § 1344(a) (allowing the director to "waive any requirement of any rule or form in situations where in the director's discretion that requirement is not necessary in the public interest or for the protection of the public, subscribers, enrollees, or persons or [insurers] subject to [the Knox-Keene Act]").

## B.

In late 2013, media outlets reported that two Catholic universities in California, Loyola Marymount University and Santa Clara University, had taken steps to exclude coverage for what the universities termed "elective" abortions from the DMHC-regulated health insurance plans

---

(5) Preventive health services.

(6) Emergency health care services, including ambulance and ambulance transport services and out-of-area coverage . . . . [and] ambulance and ambulance transport services provided through the "911" emergency response system.

(7) Hospice care pursuant to [a different provision of the California Health and Safety Code].

Cal. Health & Safety Code § 1345(b).

they obtained. Over the next several months, the DMHC conducted an internal review. That review included an assessment of the DMHC's previous practices. This assessment showed that although the DMHC had not developed a formal policy about whether insurers could restrict coverage for abortions, there were seven insurers that allowed subscribers to sign up for coverage with abortion-related exclusions, and the DMHC had either approved those plans or allowed them to take effect by not objecting.

As part of its review, the DMHC requested information from those insurers. The responses revealed that, of the more than 20 million individuals enrolled in DMHC-regulated insurance plans, at least 28,647 were enrolled in plans restricting abortion coverage.[2]

The DMHC ultimately concluded, based on both the Knox-Keene Act and California constitutional and statutory provisions addressing the right to choose whether to carry a pregnancy to term, that legal abortion is a "basic health care service" that insurers must cover. On August 22, 2014, the DMHC sent roughly identical two-page letters (the "Letters") to the seven insurers that had offered plans with abortion coverage restrictions. The Letters stated that those insurers were required to immediately remove restrictions on covering legal abortions and submit to the DMHC revised

---

[2] The 28,647 enrollees were reported by four of the seven insurers who offered abortion-restricting plans. No enrollees were reported by the other three insurers because the DMHC did not request information from the smallest of the seven insurers, one of the insurers it did contact did not provide a response, and the final insurer responded that there were no enrollees in its abortion-restricting plan.

plan documents reflecting that change.[3]  The Letters also stated that, because abortion is a "basic health care service," an insurer could bring its plan language into compliance by simply "omit[ting] any mention of coverage for abortion services in health plan documents."  The Letters did not state that there was any exemption based on an employer's objection to abortion, or that there would be a process for applying for exemptions in the future.[4]  All seven insurers who received the Letters promptly complied with the DMHC's directive.  We refer to the directive to cover abortion services, as captured through both the underlying provisions of California law and the Letters, as the "Coverage Requirement."

## C.

Skyline is a nonprofit Christian church in La Mesa, California.  It employs more than 100 people, many part-time.  Skyline adheres to the view that abortion "is incompatible with the Bible's teachings about the sanctity of human life."  Its beliefs countenance only one possible allowance for an abortion: in those "rare pregnancies where there are grave medical conditions threatening the life of the mother," and even then only after "medical and spiritual counseling" and "very prayerful consideration."  As Skyline's pastor testified, beliefs that the church and its

---

[3] The Letters explained that insurers were "not required to cover abortions that would be unlawful," citing section 123468 of the California Health and Safety Code, which defines unauthorized abortion under California law.

[4] The Letters did state that "individual health care provider[s]" (presumably meaning medical professionals) and "health care facilit[ies]" could not be required to participate in providing or paying for abortions if they had objections based on "conscience or religion."

members hold do not permit an abortion for a pregnancy resulting from rape or incest.

Skyline has, at all relevant times, provided employee health care coverage through a DMHC-regulated plan. It does so for several reasons, including compliance with the federal Affordable Care Act, a belief that providing health insurance is the proper way to care for its employees even if not legally required, and a concern that non-DMHC-regulated options (like self-insurance) would not be affordable. Before the DMHC sent the Letters, Skyline had a DMHC-regulated Aetna plan that Skyline considered acceptable and consistent with its beliefs about abortion.[5] Skyline has explained that the only coverage consistent with its beliefs would exclude "voluntary abortion, except when medically necessary to save the mother's life."

After the Letters were sent, Aetna removed references to abortion restrictions from Skyline's coverage documents. As the Letters had advised, this meant that the plan would cover abortion as a "basic health care service." When Skyline learned that its plan had changed, it contacted its insurance broker to find out whether it could obtain a plan that excluded most abortion coverage, such as through a religious exemption from the Coverage Requirement. Aetna informed Skyline's broker that it no longer offered any options that restricted coverage for legal abortion, because of "the 08-22-2014 California abortion mandate." Since

---

[5] The parties have not pointed us to the text of Skyline's former plan. But Skyline has presented sufficient evidence, for purposes of summary judgment, that the plan was consistent with its beliefs. *See VMG Salsoul, LLC v. Ciccone*, 824 F.3d 871, 875 (9th Cir. 2016) (explaining that, in evaluating an appeal from a decision granting a defendant's motion for summary judgment, we must view the record in the light most favorable to the plaintiff).

then, Skyline has switched to a different DMHC-regulated insurance provider, but Skyline has not obtained a plan that is consistent with its beliefs about abortion.

Shortly after sending the Letters, the DMHC began receiving inquiries about possible exemptions from the Coverage Requirement. About a year later, in October 2015, the DMHC approved one plan that did limit abortion coverage. That plan, offered by Anthem Blue Cross, is available to "religious employers" as defined in section 1367.25(c) of the California Health and Safety Code.[6] The plan generally excludes abortion coverage, but it covers abortion services both when the pregnancy is the result of rape or incest and when the pregnant woman's life would be in danger without the abortion.

The parties appear to agree that Skyline is a "religious employer" that would be eligible to purchase the Anthem Blue Cross plan. They also agree that the Anthem Blue Cross plan is inconsistent with Skyline's beliefs about abortion, because that plan includes coverage for abortion when the pregnancy is the result of rape or incest. Since the Letters were sent, no insurer has submitted a request to the

---

[6] Section 1367.25(c) defines a "religious employer" as "an entity for which each of the following is true: (A) The inculcation of religious values is the purpose of the entity. (B) The entity primarily employs persons who share the religious tenets of the entity. (C) The entity serves primarily persons who share the religious tenets of the entity. (D) The entity is a nonprofit organization as described in [a provision of the federal income tax code]." That section creates an exemption from a requirement that insurers cover prescription contraceptives—a requirement not at issue in this case. *See Catholic Charities of Sacramento, Inc. v. Superior Court*, 85 P.3d 67, 73–74 (Cal. 2004).

DMHC to exclude coverage for abortions when the pregnancy is the result of rape or incest.

### D.

In February 2016, Skyline sued the DMHC. Skyline alleged that the Coverage Requirement violates the U.S. Constitution's Free Exercise Clause, Establishment Clause, and Equal Protection Clause; similar provisions of the California Constitution; and the California Administrative Procedure Act. Its Complaint sought, among other things: (1) a declaration that application of the Coverage Requirement to Skyline is unlawful; (2) a permanent injunction requiring the DMHC not to enforce the Coverage Requirement against Skyline; and (3) an award of nominal damages, costs, and attorney's fees.

The DMHC moved to dismiss the Complaint, arguing that Skyline lacked Article III standing and that each of its claims failed as a matter of law. The United States District Court for the Southern District of California denied the motion as to all issues except as to the equal protection claims under the U.S. and California Constitutions, which the district court dismissed with leave to amend. Skyline opted not to replead those claims. Following discovery, Skyline and the DMHC cross-moved for summary judgment. Each party argued that it was entitled to judgment in its favor on the merits of the claims that remained in the case, and the DMHC also renewed its argument that Skyline lacked standing.

Following recusal by the district judge who had been presiding up to that point, the case was reassigned to a new judge. That judge then granted summary judgment to the DMHC without reaching the merits. The district court agreed with the DMHC that Skyline lacked standing. The

court assumed without deciding that Skyline had a cognizable injury that could be fairly traced to the DMHC, but held that any injury was not redressable because alleviating Skyline's injury would "require[] action by a non-party health care [insurer] in the form of furnishing [Skyline] with a plan containing the exemption it desires." Although standing was the only jurisdictional issue the DMHC had raised, the district court also concluded that the case was constitutionally and prudentially unripe because the DMHC had not received, and therefore had no occasion to evaluate, a formal request for "approval of a health care plan that reflects [Skyline's] religious beliefs."

Skyline timely appealed. In its appeal, Skyline argues that it has standing, that its claims are ripe, and that we should resolve in the first instance the merits of its free exercise claim by holding that it is entitled to judgment in its favor on that claim.

## II.

We review de novo a district court's decision to grant summary judgment, including its legal conclusions regarding standing and ripeness. *See Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1079 (9th Cir. 2015).

## III.

"Our role is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies consistent with the powers granted the judiciary in Article III of the Constitution." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc). Standing and ripeness are among the justiciability doctrines that help us adhere to that role. *See*

*Alaska Right to Life Political Action Comm. v. Feldman*, 504 F.3d 840, 848–49 (9th Cir. 2007).

To satisfy the "irreducible constitutional minimum" for standing, a plaintiff must establish "three elements": (1) injury in fact (2) that is fairly traceable to the challenged conduct of the defendant and (3) that is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "A plaintiff must demonstrate standing for each claim he or she seeks to press and for each form of relief sought." *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013).

"Ripeness doctrine 'is designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect . . . agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Safer Chems., Healthy Families v. EPA*, 943 F.3d 397, 411 (9th Cir. 2019) (alteration in original) (quoting *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732–33 (1998)). Determining whether a claim is ripe often requires assessing both constitutional requirements and prudential factors. *See, e.g.*, *Thomas*, 220 F.3d at 1138.

Our discussion of justiciability proceeds in three parts. First, we hold that Skyline has established each of the three elements of standing with respect to its federal free exercise claim and, relatedly, that this claim is constitutionally ripe. Second, we conclude that Skyline's free exercise claim is prudentially ripe. Third, we vacate the district court's ruling that none of Skyline's other claims are justiciable and remand for reassessment in light of our decision regarding the justiciability of the free exercise claim.

### A.

### 1.

An "injury in fact" as needed for Article III standing must be "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citations and quotation marks omitted). These requirements overlap significantly with constitutional ripeness, which requires that a case "present issues that are 'definite and concrete, not hypothetical or abstract.'" *Bishop Paiute Tribe v. Inyo County*, 863 F.3d 1144, 1153 (9th Cir. 2017) (quoting *Thomas*, 220 F.3d at 1139). We see no distinction between injury in fact and constitutional ripeness in this case, and therefore proceed, as we often do, under the same "rubric" to determine whether both requirements are satisfied. *See id.*

Skyline argues that its free exercise claim is about "whether the DMHC may lawfully apply the abortion-coverage requirement to the Church's healthcare plan." Skyline claims it was injured once the Letters directed its insurer to immediately amend Skyline's coverage to eliminate the previous abortion exclusion, and its insurer complied. Skyline contends that the Coverage Requirement forced it either to have coverage incompatible with its religious beliefs or to forego a DMHC-regulated plan. In Skyline's view, this injury is concrete and actual "because the DMHC has already enforced—and continues to enforce—the [Coverage Requirement] in a way that harms Skyline Church."

The DMHC, by contrast, argues that Skyline's free exercise claim is tied to the harm that would be inflicted if the DMHC were to reject a future request for a Skyline-tailored exemption from the Coverage Requirement—in

other words, an exemption similar to, but more restrictive of abortion coverage than, the one already allowed for the Anthem Blue Cross plan. The DMHC contends that no such exemption request has been properly made and that, accordingly, it has not definitively ruled out granting one. The DMHC's position is that Skyline's injury therefore remains hypothetical, not actual.

We hold that Skyline has suffered an injury in fact. Before the Letters were sent, Skyline had insurance that excluded abortion coverage in a way that was consistent with its religious beliefs. After the Letters were sent, Skyline did not have that coverage, and it has presented evidence that its new coverage violated its religious beliefs. There is nothing hypothetical about the situation. Although we might have a fuller record in front of us if there had been a request for a Skyline-tailored exemption and a response to that request, Article III does not require Skyline to have taken further steps before seeking redress in court for its injury.

This case contrasts sharply with, for example, our caselaw addressing preenforcement challenges to the application of rules or statutes. Such challenges can proceed only when the plaintiff "face[s] 'a realistic danger of sustaining a direct injury as a result of the [law's] operation or enforcement.'" *See Thomas*, 220 F.3d at 1139 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). For there to be jurisdiction over a preenforcement challenge, "there must be a genuine threat of imminent prosecution." *Id.* (citation and quotation marks omitted). The DMHC suggests that Skyline does not face such a threat. But that suggestion goes to an issue that is simply irrelevant, because this case involves a postenforcement challenge: the Letters told seven insurers that they were required to immediately change their

coverage, and all of them (including Skyline's insurer) have already complied. The situation might be different if the DMHC had made clear that no coverage changes would be required until individualized exemption requests had been presented and reviewed, but that is not what happened.

Relatedly, we have held that some challenges to "benefit-conferring rule[s]" should be dismissed as unripe when those rules have not yet been applied to make benefit decisions. *See Mont. Envtl. Info. Ctr. v. Stone-Manning*, 766 F.3d 1184, 1190–91 (9th Cir. 2014) (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 69 (1993) (O'Connor, J., concurring in the judgment)). But this approach is intended to make sure that we do not prematurely exercise jurisdiction when a rule has the effect of only potentially precluding a future benefit, and we cannot make a "firm prediction" that the future benefit will actually be unavailable to the plaintiff. *See Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1435–36 (9th Cir. 1996) (quoting *Catholic Soc. Servs.*, 509 U.S. at 69 (O'Connor, J., concurring in the judgment)). Here, there is no need to make an uncertain prediction because Skyline has already lost something it previously had.

**2.**

A plaintiff must show that its "injury is 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014) (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997)). Purely "self-inflicted injuries" are insufficient. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415–18 (2013). We do not, however, "require the defendant's action to be the sole source of injury," *Wash. Envtl. Council*, 732 F.3d at 1142, and "[c]ausation may be found even if there are multiple

links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury," *Mendia*, 768 F.3d at 1012.

Here, there is a direct chain of causation from the DMHC's directive requiring seven insurers to change their coverage, to Skyline's insurer's doing so, to Skyline's losing access to the type of coverage it wanted. The DMHC argues that any injury is "self-inflicted" because Skyline chose to continue having a DMHC-regulated plan rather than either purchasing a non-DMHC-regulated plan or refraining from providing employee health insurance coverage at all—in which case Skyline would potentially be required to make a "shared responsibility" payment to the Internal Revenue Service pursuant to the Affordable Care Act. *See* 26 U.S.C. § 4980H(a). But Skyline has offered evidence that resorting to such alternatives would be a worse fit for its needs than having a DMHC-regulated plan. It can hardly be said that Skyline caused its own injury when it has shown that, if it were to pursue any of the alternatives floated by the DMHC, it would remain worse off than it had been before the DMHC issued the Letters.

### 3.

To establish redressability, a plaintiff must show that "it is likely, as opposed to merely speculative, that [its] injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). It is not necessary to show "a guarantee that [the plaintiff's] injuries will be redressed." *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012) (quoting *Graham v. FEMA*, 149 F.3d 997, 1003 (9th Cir. 1998)).

As an initial matter, Skyline requested nominal damages in its Complaint. Nominal damages would redress Skyline's injury, even if only to a minimal extent. Nothing more is

needed to establish redressability for that form of relief. *See Jacobs v. Clark Cty. Sch. Dist.*, 526 F.3d 419, 425–27 (9th Cir. 2008).[7]

Skyline also sought a declaration that the Coverage Requirement violates its rights under the Free Exercise Clause and a permanent injunction requiring the DMHC not to enforce the Coverage Requirement. We conclude that these forms of relief, which can be treated together for purposes of our discussion, would likely provide Skyline redress. *See Clark v. City of Lakewood*, 259 F.3d 996, 1007 (9th Cir. 2001).

The DMHC argues that a favorable decision would be unlikely to redress Skyline's injury because Skyline cannot show that an insurer would likely agree to offer coverage consistent with Skyline's beliefs. It is true that redressability is lacking "if the injury complained of is 'th[e] result [of] the *independent* action of some third party not before the

---

[7] When the DMHC argued in the district court that Skyline lacked standing, Skyline did not, in either its opposition brief or during the hearing on the motion, respond that it had standing at least to recover nominal damages. Although we generally do not "entertain[] arguments on appeal that were not presented or developed before the district court," we have discretion to do so when, as relevant here, "the issue presented is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed." *See In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010) (first quoting *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1321 (9th Cir. 1998); then quoting *Bolker v. Comm'r*, 760 F.2d 1039, 1042 (9th Cir. 1985)). The question whether Skyline's injury is redressable through nominal damages is such a purely legal question. In any event, our decision to reach this issue is not dispositive of whether there is jurisdiction over Skyline's free exercise claim because, for the reasons explained below, Skyline's injury is also redressable through other forms of relief it requested.

court.'"  *Bennett*, 520 U.S. at 169 (alterations and emphasis in original) (quoting *Lujan*, 504 U.S. at 560–61).  But a plaintiff *does* have standing when the defendant's actions produce injury through their "determinative or coercive effect upon the action of someone else." *Id.*; *see also Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (explaining that standing is present when the theory of harm "does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties").[8]

Here, the DMHC's action of issuing the Letters had a "determinative or coercive effect" on the seven insurers who received them.  *See Bennett*, 520 U.S. at 169.  Before the DMHC issued the Letters, those seven insurers had offered plans with abortion coverage restrictions, some of which comported with Skyline's beliefs.  Then, a regulatory agency with jurisdiction to approve (or disapprove) the terms of those insurers' offerings throughout California informed the insurers that, "effective [immediately]," they "must comply with California law with respect to the coverage of legal abortions" by removing such restrictions.  Predictably, all seven complied.

---

[8] This aspect of redressability has some overlap with the traceability requirement.  *See Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984) (explaining that, although traceability and redressability are separate inquiries, they were initially articulated as "two facets of a single causation requirement" (citation omitted)), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).  We focus on it in our redressability discussion because the DMHC's main argument is not that the Letters did not cause insurers to change their coverage, but rather that a court order could not effectively undo that change.

The fact that insurers had previously offered plans that were acceptable to Skyline is strong evidence that, if a court were to order that the Coverage Requirement could not be applied to prevent approval of a health plan for Skyline that comports with Skyline's religious beliefs, at least one of the many insurers who do business in California would agree to offer the type of plan Skyline seeks.  We acknowledge that it is possible no insurer would do this.  But we need not be *certain* how insurers would respond.  *See Renee*, 686 F.3d at 1013.  Instead, our inquiry is focused on whether the predictable effect of an order granting the relief Skyline seeks is that at least one insurer would be willing to sell it a plan that accords with its religious beliefs.  We conclude that is the predictable effect.

This redressability conclusion comports with our precedent as well as that of the Eighth Circuit.  In *Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009), for example, we addressed a challenge to rules promulgated by the Washington State Board of Pharmacy that, among other things, required pharmacies to dispense medications approved by the Federal Drug Administration.  *Id.* at 1113, 1116.  The plaintiffs, who included a pharmacy and two individual pharmacists, contended that dispensing Plan B, an FDA-approved contraceptive drug, would conflict with their religious beliefs.  *Id.* at 1114, 1117.  Although the rules did not obligate pharmacists to dispense medications to which they objected, the plaintiff pharmacists contended that the rules required their employers to hire additional pharmacists in order to accommodate their beliefs, putting at risk their jobs with any employer who could not hire additional staff.  *Id.* at 1117.  Indeed, one of the plaintiff pharmacists had already lost her job because her employer could not accommodate her refusal to dispense Plan B, while the other plaintiff pharmacist expected to be fired on similar grounds.

*See id.* at 1121. We held that both of the individual pharmacist plaintiffs had standing. *Id.* at 1119–22. We noted that those plaintiffs' injuries—tied to the substantial risk of losing their jobs—were "indirect" because the harm depended on actions taken by their employers. *Id.* at 1121. But we explained that their injuries were redressable because, if the challenged rules were invalidated, the pharmacists would "not be limited to employment only at pharmacies able to accommodate their religious views." *Id.* at 1122. Similarly, here, if Skyline's challenge succeeds, Skyline will not be limited to purchasing health insurance that either conflicts with its beliefs or conflicts with its desire to purchase a DMHC-regulated plan.

The Eighth Circuit's decision in *Wieland v. United States Department of Health & Human Services*, 793 F.3d 949 (8th Cir. 2015), addressed a redressability question even more analogous to that here. In *Wieland*, a member of the Missouri legislature and his spouse challenged provisions of the Affordable Care Act and implementing regulations that require certain insurers to cover contraceptive services. *See id.* at 952–53. The plaintiffs claimed that these laws caused their state-provided group health care plan to include contraceptive coverage, and that this coverage—which they had previously been able to opt out of—violated their religious beliefs. *See id.* at 952–54. The Eighth Circuit held that the redressability requirement of standing was satisfied. *Id.* at 957. Even though a court order enjoining the federal government from enforcing the challenged laws would not *require* the plaintiffs' state-provided health care plan to offer a contraceptive-free option, the fact that the plan had done so before the enactment of the challenged provisions was "persuasive evidence that [the plan] would do so again if the [plaintiffs were to] obtain their requested relief." *Id.* So too here: we can infer from the insurers' previous practices that,

if the DMHC were enjoined from enforcing the Coverage Requirement as to any plan purchased by Skyline, Skyline could likely find a DMHC-regulated insurer willing to offer it a plan with the limitations it seeks on abortion coverage— as had been true before the DMHC sent the Letters.

The DMHC also argues that Skyline's suit does not challenge the statutes and constitutional provisions that underpin the Letters and, as a result, any court order would not provide redress because those requirements would remain in place no matter what such an order might say about the Letters.  But we do not view this litigation as narrowly focused on the Letters themselves.  We construe Skyline's Complaint as seeking relief that would ensure that the Coverage Requirement does not affect Skyline's ability to obtain a health plan that comports with its beliefs, whatever the Requirement's source in state law.  If Skyline were to prevail, that would mean that its free exercise rights trumped the DMHC's authority to require Skyline's plan to comport with the Coverage Requirement, regardless of the source of that authority.

### B.

Having concluded that the Article III requirements for jurisdiction are satisfied for Skyline's federal free exercise claim, we move on to prudential ripeness.  "Courts have regularly declined on prudential grounds to review challenges to recently promulgated laws or regulations in favor of awaiting an actual application of the new rule." *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 837 (9th Cir. 2012).  "In evaluating the prudential aspects of ripeness, our analysis is guided by two overarching considerations: 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'"  *Thomas*, 220 F.3d at

1141 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)).[9]

As to the first prudential ripeness prong, "[a] claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Stormans*, 586 F.3d at 1126 (quoting *US West Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1118 (9th Cir. 1999)). Relevant considerations include "whether the administrative action is a definitive statement of an agency's position; whether the action has a direct and immediate effect on the complaining parties; whether the action has the status of law; and whether the action requires immediate compliance with its terms." *Id.* (quoting *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 780 (9th Cir. 2000)).

Skyline's challenge to the Coverage Requirement is fit for decision now. After the DMHC formalized the Coverage Requirement by issuing the Letters, there was an immediate effect upon Skyline: its insurer promptly amended Skyline's plan. Indeed, such immediate compliance was required by the terms of the Letters. And the state statutes and

---

[9] In *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014), the Supreme Court "cast doubt on the prudential component of ripeness," identifying prudential ripeness as "in some tension" with "the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Clark v. City of Seattle*, 899 F.3d 802, 809 n.4 (9th Cir. 2018) (quotation marks omitted) (quoting *Susan B. Anthony List*, 573 U.S. at 167). Because the Supreme Court "has not yet had occasion to 'resolve the continuing vitality of the prudential ripeness doctrine,'" we apply it here regardless of any uncertainty about its life expectancy. *See Fowler v. Guerin*, 899 F.3d 1112, 1116–18, 1116 n.1 (9th Cir. 2018) (quoting *Susan B. Anthony List*, 573 U.S. at 167), *cert. denied*, 140 S. Ct. 390 (2019).

constitutional provisions that form the basis for the Coverage Requirement of course have the status of law. The Letters, as a further formalization of that requirement, do as well. *See Missionary Guadalupanas of the Holy Spirit Inc. v. Rouillard*, 251 Cal. Rptr. 3d 1, 9 (Ct. App. 2019) (construing the Letters as a "regulation" under California law), *review and depublication request denied*, No. S258380 (Cal. 2019).[10]

We acknowledge that it is a somewhat closer question whether the DMHC's actions to date amount to a definitive statement of its position on whether it would approve a Skyline-tailored insurance plan. The DMHC retains discretion to create exemptions from the Coverage Requirement. *See* Cal. Health & Safety Code §§ 1343(b), 1344(a), 1367(i). It has already granted an exemption once by allowing Anthem Blue Cross to offer a "religious employers" plan that excludes abortion coverage except in cases of rape, incest, or when the pregnant woman's life is at risk. And, if asked in the future to approve a plan like the one Skyline seeks, limiting abortion coverage to cases in which the pregnant woman's life is at risk, the DMHC might

---

[10] The plaintiffs in *Missionary Guadalupanas* brought in state court a challenge to the Coverage Requirement that focused on whether the Letters violated the California Administrative Procedure Act. *See* 251 Cal. Rptr. 3d at 4. There, the trial court ruled in favor of the DMHC, and the California Court of Appeal affirmed in a published decision, reasoning that the Letters had reached "the only legally tenable interpretation" of California law. *Id.* at 7–12. Because the Court of Appeal's decision in *Missionary Guadalupanas* represents "the ruling of the highest state court issued to date," and we have not seen any "persuasive data" that the California Supreme Court would reach different conclusions, we are "bound by" that decision to the extent its interpretation of California law is relevant. *See Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1266–67 (9th Cir. 2017) (quoting *Miller v. County of Santa Cruz*, 39 F.3d 1030, 1036 n.5 (9th Cir. 1994)).

agree.  The possibility that the DMHC may change course does not, however, mean that Skyline needed to jump through more hoops before filing this case—particularly when the DMHC did not even suggest in the Letters that it would entertain any exemption requests, or establish a specific procedure to review any exemption requests.

Moreover, even now, when its litigation position hinges on the idea that Skyline needed to make a request similar to the one made by Anthem Blue Cross before suing, the DMHC insists that Skyline could not request an exemption on its own, but instead must enlist a willing insurer to make a request to the DMHC on its behalf.  In the DMHC's view, then, the only way for Skyline to ripen its claim would be to persuade a third party to submit a request for a discretionary exemption—even though there appears to be no established procedure for doing so—and then wait an unknown amount of time for a response that may never come, all while Skyline's injury remains ongoing.

The DMHC has not identified any case in which a party that was already injured was required to navigate the type of ill-defined terrain Skyline would have faced to ripen its claim in the way the DMHC argues is required, and we have not found any.  To the contrary, our caselaw compels the conclusion that this case is already prudentially ripe.  For example, in *Oklevueha*, we addressed a church's challenge under the Religious Freedom Restoration Act to the government's enforcement of the Controlled Substances Act.  676 F.3d at 833–34.  In that case, federal law-enforcement officers had, at one point, seized a FedEx package containing one pound of marijuana that was intended for the church's religious uses.  *Id.* at 834.  But the church did not allege that it or its members were prosecuted following the seizure or had ever been prosecuted in

connection with the church's procurement or use of marijuana. *Id.* Instead, the church's allegations were based on fear of future enforcement of the Controlled Substances Act through prosecution or further seizures. *See id.* We held that this challenge to future enforcement was ripe, notwithstanding a regulation providing that "[a]ny person may apply for an exception to the application of any provision" of the relevant law. *See id.* at 838 (quoting 21 C.F.R. § 1307.03). The church was not required to apply for an exception before filing suit because the church had already suffered a seizure, and it was likely enough that further enforcement would follow. *See id.* The same is true here: Skyline need not make further attempts to persuade the DMHC to create an exemption from the Coverage Requirement because the enforcement of that requirement has already caused injury.

Because Skyline's federal free exercise claim is fit for review now, we need not and do not reach the second prong of the prudential ripeness inquiry—whether delaying review would impose a hardship on Skyline. "Hardship serves as a counterbalance to any interest the judiciary has in delaying consideration of a case," and here we see no need to delay. *See Oklevueha*, 676 F.3d at 838.

## C.

For the foregoing reasons, Skyline's federal free exercise claim is justiciable. Aspects of our discussion of the justiciability of that claim may apply equally to Skyline's other claims, but the parties have only briefed the merits of the federal free exercise claim on appeal. In light of the limited scope of what the parties have told us about the nature of Skyline's other claims, we vacate the district court's ruling that those claims are not justiciable and

remand to the district court to reassess the justiciability of
Skyline's remaining claims in light of our decision.

## IV.

Skyline argues that we should not only reverse the
district court's ruling on justiciability of the federal free
exercise claim but should also resolve it on the merits, rather
than prolonging the litigation by remanding for the district
court to consider the merits in the first instance. We decline
to exercise our equitable discretion to do so.

"In general, an appellate court does not decide issues that
the trial court did not decide." *Planned Parenthood of
Greater Wash. & N. Idaho v. U.S. Dep't of Health & Human
Servs.*, 946 F.3d 1100, 1110 (9th Cir. 2020). That "general
rule, however, is flexible—an appellate court can exercise its
equitable discretion to reach an issue in the first instance."
*Id.* One of the limited circumstances in which that discretion
is permissible is when the issue not addressed by the trial
court is a "purely legal issue." *Id.* at 1110–11.

We recognize that there are some reasons to resolve
Skyline's federal free exercise claim, which presents such a
purely legal issue, now. In the district court, both parties
filed cross-motions for summary judgment on the merits of
all claims. The parties have now laid out again in their
appellate briefs their positions on the merits of Skyline's
federal free exercise claim. Whether to grant summary
judgment in favor of either party on that claim is a purely
legal issue that we could resolve by looking to a record that
each party has contended is sufficient to support judgment in
its favor. Skyline urges us to proceed to the merits of its free
exercise claim rather than remanding and thereby
guaranteeing that its claimed injury will persist during the
further litigation.

These considerations may have persuaded us to exercise our equitable discretion to reach the merits of Skyline's federal free exercise claim. But after oral argument in this appeal, the Supreme Court granted a petition for a writ of certiorari in which one of the questions presented is "[w]hether *Employment Division v. Smith* [494 U.S. 872 (1990)] should be revisited." *See* Petition for a Writ of Certiorari, *Fulton v. City of Philadelphia*, No. 19-123 (U.S. July 22, 2019), *cert. granted*, 140 S. Ct. 1104 (2020). Skyline's free exercise claim turns on the application of *Smith* and later caselaw implementing its holding. When the Supreme Court is in the process of considering a legal issue central to an appeal before us, we typically wait to decide the appeal until after the Supreme Court has ruled. Doing so here, however, would also hold up the resolution of Skyline's other claims, the merits of which have not even been briefed to us. The prospect of such delay persuades us that we should remand the case rather than keeping the entire action in abeyance for a long period of time.

Accordingly, we remand and leave it to the district court to determine, after resolving whether Skyline's other claims are justiciable, *see supra* Part III.C, when it would be appropriate to proceed to the merits of Skyline's claims for which there is jurisdiction.

## V.

For the foregoing reasons, we reverse the district court's ruling that it lacked jurisdiction over Skyline's federal free exercise claim, vacate the district court's ruling that it lacked jurisdiction over Skyline's other claims, and remand for further proceedings consistent with this opinion.

**REVERSED IN PART, VACATED IN PART, AND REMANDED.**