Jeremiah Galus (Arizona Bar No. 030469)*
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jgalus@ADFlegal.org

Jacob E. Reed (Ohio Bar No. 99020)*
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176
(571) 707-4718
jreed@ADFlegal.org

Charles S. LiMandri (California Bar No. 110841)
Paul M. Jonna (California Bar No. 265389)
Jeffrey M. Trissell (California Bar No. 292480)
Freedom of Conscience Defense Fund
P.O. Box 9520
Rancho Santa Fe, CA 92067
(858) 759-9948
cslimandri@limandri.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SKYLINE WESLEYAN CHURCH**, <br><br> Plaintiff, <br><br> v. <br><br> **CALIFORNIA DEPARTMENT OF MANAGED HEALTH CARE; MARY WATANABE**, in her official capacity as Director of the California Department of Managed Health Care, <br><br> Defendants. | Case No.: 3:16-cv-00501-LL-MSB <br><br> **PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT (ECF No. 67)** <br><br> Date:      April 6, 2022 <br> Time:      1:30 p.m. <br> Courtroom: 2B <br> Judge:    Hon. Linda Lopez |

1

## **TABLE OF CONTENTS**

2  TABLE OF AUTHORITIES ........................................................................... ii

3  INTRODUCTION .......................................................................................... 1

4  FACTUAL BACKGROUND ........................................................................ 2

5
6        A.    Skyline and its religious beliefs. ............................................. 2

7        B.    The DMHC and the Knox-Keene Act ..................................... 3

8        C.    The "Abortion Coverage Requirement" .................................. 4

9        D.    Procedural History .................................................................. 7

10  ARGUMENT .................................................................................................. 9

11
12    I.    Skyline is entitled to summary judgment on its federal free-exercise
claim. ............................................................................................... 9

13
14        A.    The Abortion Coverage Requirement triggers strict scrutiny under
the Free Exercise Clause because it is not generally applicable. ............... 9

15
16            1.  The Abortion Coverage Requirement includes a system of
individual exemptions. ........................................................ 10

17
18            2.  There also are categorical exemptions from the Abortion
Coverage Requirement ....................................................... 12

19        B.    The Abortion Coverage Requirement also triggers strict scrutiny
because it is not neutral. ....................................................... 13

20
21        C.    The Abortion Coverage Requirement fails strict scrutiny as applied
to Skyline Church ................................................................. 15

22
23    II.    A permanent injunction can issue based on the free-exercise violation
alone, eliminating any need to address the remaining claims ............... 16

24  CONCLUSION ............................................................................................. 17

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Barnes-Wallace v. Boy Scouts of America.,*

4

    No. 00CV1726-J (AJB), 2004 WL 7334946 (S.D. Cal. Apr. 12, 2004) ......................17

5

*Barnes-Wallace v. City of San Diego,*

6

    704 F.3d 1067 (9th Cir. 2012) ................................................................................17

7

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,

8

    508 U.S. 520 (1993)..................................................................12, 13, 14, 15

9

*City of Boerne v. Flores*,

10

    521 U.S. 507 (1997)..................................................................................2

11

*Dahl v. Board of Trustees of Western Michigan University*,

12

    15 F.4th 728 (6th Cir. 2021) ...........................................................................12

13

*Employment Division, Department of Human Resources of Oregon v. Smith*,

14

    494 U.S. 872 (1990)..................................................................9, 10, 11, 12

15

*Foothill Church v. Watanabe*,

16

    3 F.4th 1201 (9th Cir. 2021) .................................................................................9

17

*Fulton v. City of Philadelphia*,

18

    141 S. Ct. 1868 (2021)......................................................................passim

19

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,

20

    546 U.S. 418 (2006)..................................................................................15, 16

21

*GTE Sylvania, Inc. v. Consumers Union of United States, Inc.*,

22

    445 U.S. 375 (1980)......................................................................................11

23

*Guam Society of Obstetricians & Gynecologists v. Ada*,

24

    962 F.2d 1366 (9th Cir. 1992) ............................................................................17

25

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,

26

    140 S. Ct. 2367 (2020).................................................................................16

27

*Maryland Casualty Co. v. Knight*,

28

    96 F.3d 1284 (9th Cir. 1996) ...............................................................................17

*Pennsylvania v. President United States*,

   930 F.3d 543 (3d Cir. 2019)..........................................................................16

*Skyline Wesleyan Church v. California Department of Managed Health Care*,

   968 F.3d 738 (9th Cir. 2020) ..................................................................passim

*Tandon v. Newsom*,

   141 S. Ct. 1294 (2021) ..........................................................................12, 13

**Statutes**

Cal. Code Regs. tit. 28, § 1300.43 ...................................................................4, 13

Cal. Code Regs. tit. 28, § 1300.67 ........................................................................4

Cal. Health & Safety Code § 1340..........................................................................3

Cal. Health & Safety Code § 1343(b)..........................................................4, 10, 11

Cal. Health & Safety Code § 1343(e)..........................................................4, 13

Cal. Health & Safety Code § 1344(a)..........................................................4, 11

Cal. Health & Safety Code § 1345(b).....................................................................3

Cal. Health & Safety Code § 1367(i).........................................................3, 4, 10, 11

**Other Authorities**

DMHC, *Director's Letters & Opinions, Communications from the DMHC*

   (August 22, 2014), https://perma.cc/JMD2-LTD2. ..........................................6

National Health Law Program, *Reproductive & Sexual Health, Health Care Refusals*,

   https://perma.cc/VFV6-V3AD (last visited February 1, 2022). .......................5

**Constitutional Provisions**

U.S. Const. art. VI, cl. 2...................................................................................16

Plaintiff's Supplemental Memorandum of Points and Authorities

(3:16-cv-00501-LL-MSB)

# **INTRODUCTION**

In August 2014, the California Department of Managed Health Care (DMHC) mandated that religious organizations cover elective abortion in their employee healthcare plans, regardless of the organization's religious beliefs. The DMHC's directive directly harmed Skyline Wesleyan Church, which had a plan that excluded elective abortion coverage consistent with the church's beliefs. The DMHC did not even notify Skyline of this policy change when implemented in August 2014; the church discovered the change on its own, more than a month later. And despite years of repeated requests, the DMHC refuses to change its policy or to accommodate Skyline's beliefs. Today, more than seven years later, Skyline's healthcare plan *still* covers abortion.

Despite Skyline being forced to live with this intentional violation of its religious beliefs, the DMHC argued that the church lacked standing to even challenge the coverage requirement. The presiding judge at the time agreed and dismissed Skyline's claims. But the Ninth Circuit reversed, concluding that there was "a direct chain of causation" from the DMHC's coverage mandate to Skyline "losing access" to a plan that accommodated its religious beliefs. *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 748 (9th Cir. 2020). The Ninth Circuit also held that a favorable court ruling could redress Skyline's injury and that "Skyline need not make further attempts to persuade the DMHC to create an exemption from the Coverage Requirement because the enforcement of that requirement has already caused injury." *Id*. at 753. This Court was asked to decide the merits of Skyline's free-exercise claim. *Id*. at 754.

And the merits could not be clearer in light of the Supreme Court's recent decision in *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021). In *Fulton*, the Supreme Court reaffirmed that a law or regulation that provides a "mechanism for individualized exemptions" is not generally applicable. *Id*. at 1877. Thus, when the state extends discretionary exemptions to a policy, it must grant exemptions for cases of "religious hardship" or present compelling reasons not to do so. *Id*.

As detailed below, individualized exemptions from the Abortion Coverage Requirement are available for "good cause" or if "in the public interest." So *Fulton* is decisive: strict scrutiny must apply. And the State cannot survive "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). Forcing Skyline to provide likeminded church employees with elective abortion coverage is in no way a compelling interest. Nor is the coverage requirement the least restrictive way to achieve any interest the State might have. Indeed, the State's "creation of a system of exceptions" undermines any claim that the coverage requirement "can brook no departures." *Fulton*, 141 S. Ct. at 1882.

Because *Fulton* confirms that the Abortion Coverage Requirement violates Skyline's free-exercise rights, this Court should grant Skyline's motion and put an end to the ongoing constitutional violation.

## FACTUAL BACKGROUND

The facts are fully set forth in Skyline's Memorandum of Points and Authorities in Support of Motion for Summary Judgment (ECF No. 67-1), Skyline's Separate Statement of Undisputed Material Facts in Support of Motion for Summary Judgment (ECF No. 67-2), the Declarations of Dr. James Garlow (ECF No. 67-3), Gayle Amann (ECF No. 67-4), and Jeremiah Galus (ECF No. 67-5) and the exhibits thereto. A summary of the facts pertinent to the legal issues addressed in this supplemental brief are set forth below.

### A.     Skyline and its religious beliefs.

Skyline is a Christian church located in La Mesa, California. ECF No. 67-3, Garlow Decl. ¶ 4. It adheres to *The Discipline of Wesleyan Church*, which forbids abortion except in those "rare pregnancies where there are grave medical conditions threatening the life of the mother." *Id*. ¶¶ 6–9. Consistent with this doctrine, Skyline believes and teaches that elective abortion violates the Bible's command against the intentional destruction of innocent human life. *Id*. ¶ 8.

Skyline employs over 100 people. ECF No. 67-6 at 176, Galus Decl., Ex. 3 (Amann Dep.).[1] As a condition of employment, Skyline's employees must be members of the congregation and agree with and abide by the church's religious beliefs, including its beliefs about abortion. ECF No. 67-3, Garlow Decl. ¶ 15. Because Skyline believes it has a religious obligation to care for the physical, mental, and emotional health of its employees, it offers them a generous health insurance plan. *Id.* ¶ 13.

Skyline previously could—and did—purchase an employee healthcare plan that excluded elective abortion coverage consistent with its religious beliefs. ECF No. 67-6 at 45–46, Galus Decl., Ex. 1 (Garlow Dep.); ECF No. 67-6 at 132, Galus Decl., Ex. 2 (Grant Dep.). But in August 2014, the DMHC summarily announced to insurers that it was now illegal for them to restrict abortion coverage in any way. As a result of this mandate, Skyline's healthcare plan was amended, without its knowledge or consent, to include elective abortion coverage in violation of the church's beliefs. ECF No. 67-6 at 17, Galus Decl., Ex. 1 (Garlow Dep.); ECF No. 67-6 at 132, Galus Decl., Ex. 2 (Grant Dep.).

## B.   The DMHC and the Knox-Keene Act

The DMHC is the regulatory body responsible for enforcing California's Knox-Keene Health Care Service Plan Act of 1975 (the "Knox-Keene Act") and its related regulations. Cal. Health & Safety Code § 1340, *et seq.*

Under the Knox-Keene Act, "health care service plans" must provide coverage for "all of the basic health care services included in subdivision (b) of Section 1345." Cal. Health & Safety Code § 1367(i) (the "basic health care services" provision). As defined, "basic health care services" means: (1) physician services; (2) hospital inpatient services and ambulatory care services; (3) diagnostic laboratory and diagnostic and therapeutic radiologic services; (4) home health services; (5) preventive health services; (6) emergency healthcare services; and (7) hospice care. *Id.* § 1345(b). Pursuant to its

---

[1] For ease of reference, all page number citations refer to the ECF page number assigned by the Court's CM/ECF system.

regulatory authority, the DMHC has defined the scope of "basic health care services" to include services only "where medically necessary." Cal. Code Regs. tit. 28, § 1300.67.

Yet there are many exemptions from the "basic health care services" provision. For example, the director of the DMHC "may, for good cause, by rule or order exempt a plan contract or any class of plan contracts from that requirement." Cal. Health & Safety Code § 1367(i). The director also may exempt "any class of persons or plan contracts" from *any* of the Act's requirements, including the "basic health care services" provision, if she believes such exemption is "in the public interest." *Id*. § 1343(b); *see also id*. § 1344(a) (director may "waive any requirement of any rule" if the director determines in her "discretion" that the requirement is not "in the public interest"). What's more, certain healthcare plans have been categorically exempted from the Act's requirements, either by statute or regulation. *See, e.g.*, Cal. Health & Safety Code § 1343(e) (exempting health care plans "directly operated by a bona fide public or private institution of higher learning"); Cal. Code Regs. tit. 28, § 1300.43 (exempting "small plans" administered solely by an employer that "does not have more than five subscribers").

### C.  The "Abortion Coverage Requirement"

Before August 2014, the DMHC allowed religious organizations like Skyline to exclude or limit abortion coverage in their healthcare plans. For example, the DMHC previously approved plan language that allowed religious organizations to:

- Exclude coverage for "elective abortions" and "voluntary termination of pregnancy," *see, e.g.*, ECF No. 67-9 at 8, Galus Decl., Ex. 16 (showing that insurer deleted this previously approved plan language for religious employers in response to August 2014 letters); ECF No. 92-2 at 3, Galus Decl., Ex. 38 (same);

- Exclude coverage for "voluntary abortion, except when medically necessary to save the mother's life," *see, e.g.*, ECF No. 67-9 at 10, Galus Decl., Ex. 16 (showing that insurer deleted this previously approved plan language for religious employers in response to August 2014 letters); and

- Limit coverage to abortions performed when, "due to an existing medical condition, the mother's life would be in jeopardy as a direct result of pregnancy," *see, e.g.*, ECF No. 67-9 at 50–53, Galus Decl., Ex. 19 (letter from DMHC approving this plan language for Catholic hospital system).

But in November 2013, the DMHC was contacted by representatives from the National Health Law Program ("NHeLP"), an organization that promotes the expansion of abortion access and "develops strategies in partnership with state . . . policymakers" to eliminate religious "refusals."[2] NHeLP told the DMHC that two Catholic universities— Loyola Marymount University ("LMU") and Santa Clara University ("SCU")—"recently went public that they were eliminating abortion coverage from their employee health plans." ECF No. 92-1 at 2, Galus Decl., Ex. 27. NHeLP therefore requested a meeting with DMHC officials "to figure out the best way of addressing these issues." *Id*. In response, the DMHC met with representatives of NHeLP, the ACLU, and Planned Parenthood, and began requesting information from insurers about the scope of abortion coverage in their healthcare plans. ECF No. 67-6 at 322–25, Galus Decl., Ex. 4 (DMHC 30(b)(6) Dep.); *accord Skyline*, 968 F.3d at 743. Those information requests confirmed that some religious organizations, but only religious organizations, had purchased plans excluding or limiting abortion coverage. *E.g.*, ECF No. 92-2 at 4, Galus Decl., Ex. 38 (insurer advising that all the employer groups that had purchased plans restricting abortion coverage qualified as a "religious employer"); ECF No. 92-3 at 2, Galus Decl., Ex. 42 (same); ECF No. 92 at 2, Galus Decl., Ex. 24 (insurer advising that all the groups that had restricted abortion coverage were "religious or religious-affiliated organizations").

A few months later, Planned Parenthood expressed concern about the "DMHC's ability to find a solution," so it warned the DMHC's parent agency that it was considering

---

[2] National Health Law Program, *Reproductive & Sexual Health, Health Care Refusals*, https://perma.cc/VFV6-V3AD (last visited February 1, 2022).

legislation to resolve the issue. ECF No. 67-10 at 25, Galus Decl., Ex. 33. Planned Parenthood said it would forgo legislation, however, in exchange for an "administrative solution," provided the DMHC agreed to "not approve any further plans that exclude coverage for abortion," "clarif[y] that there is no such thing as an elective or voluntary abortion exclusion," and "find a solution to fix the already approved plans being offered to employees of LMU for 2014 and SCU for 2015." *Id.*

The "solution," it turned out, was for the DMHC to say that the Knox-Keene Act mandated elective abortion coverage. On August 22, 2014, the DMHC issued letters to California health insurers "remind[ing]" them that the Act's "basic health care services" provision requires coverage for all legal abortions. ECF No. 67-9 at 56–57, Galus Decl., Ex. 20.[3] The letters stated that, "effective as of [August 22, 2014]" and "[r]egardless of existing [plan] language," healthcare plans "must comply with California law with respect to the coverage of legal abortions." *Id.* The DMHC thus ordered the insurers to "amend current health plan documents" to remove "any exclusion of coverage for 'voluntary' or 'elective' abortions and/or any limitation of coverage to only 'therapeutic' or 'medically necessary' abortions." *Id.* Finally, the letters advised the insurers that they could amend their plans and start covering elective abortions by simply "omit[ting] any mention of coverage for abortion services in health plan documents." *Id.* All the insurers "promptly complied with the DMHC's directive," causing Skyline and other religious employers to cover abortions in violation of their beliefs. *Skyline*, 968 F.3d at 744.

The letters did not provide "any exemption based on an employer's objection to abortion." *Id.*; *see also* ECF No. 67-9 at 56–57, Galus Decl., Ex. 20. Nevertheless, when Skyline learned that its plan had changed, it sought "a religious exemption from the

---

[3] The DMHC sent virtually identical letters to seven insurers that offered religious organizations products that restricted abortion coverage and posted those letters on its website, where they remain as guidance. *See* DMHC, *Director's Letters & Opinions, Communications from the DMHC* (August 22, 2014), https://perma.cc/JMD2-LTD2. This brief cites to the letter sent to Skyline's insurer at the time, Aetna.

Coverage Requirement." *Skyline*, 968 F.3d at 745. The church's insurer, however, told Skyline that "it no longer offered any options that restricted coverage for legal abortion, because of 'the 08-22-2014 California abortion mandate.'" *Id.*; ECF No. 67-4, Amann Decl. ¶ 4. Since then, Skyline has been unable to obtain a plan that offers coverage consistent with its religious beliefs about abortion. ECF No. 67-4, Amann Decl. ¶¶ 4–5. And the DMHC has refused Skyline's direct request for an exemption. *See* Suppl. Decl. of Jeremiah Galus, attached hereto as Exhibit 1.

### D.   Procedural History

This case is ready for a final adjudication on the merits. Skyline filed its complaint in state court in February 2016, alleging that the Abortion Coverage Requirement violates the U.S. Constitution's Free Exercise Clause, Establishment Clause, and Equal Protection Clause; similar provisions of the California Constitution; and the California Administrative Procedure Act. ECF No. 1 at 9–29. The complaint sought, among other things: (1) a declaration that application of the Abortion Coverage Requirement to Skyline is unlawful; (2) a permanent injunction requiring the DMHC not to enforce the Abortion Coverage Requirement against Skyline; and (3) an award of nominal damages, costs, and attorney's fees. *Id.* at 28-29.

After removing the case to this Court, Defendants moved to dismiss Skyline's claims. ECF No. 20. The State argued that Skyline lacked standing and that each of its claims failed as a matter of law. *Id.* The Court denied the motion as to all issues except for the equal protection claims under the U.S. and California Constitutions, which the Court dismissed with leave to amend. ECF No. 28. Skyline opted not to replead those claims. The parties then completed discovery, and both moved for summary judgment. *See* ECF Nos. 67, 68. Each party argued that it was entitled to judgment in its favor on the merits, and the DMHC also renewed its argument that Skyline lacked standing. *Id*.

Following recusal by the judge who had been presiding up to that point, the case was reassigned to a new judge. That judge then granted summary judgment to the DMHC without reaching the merits. ECF No. 91. The Court agreed with the DMHC that Skyline

1    lacked standing. The Court assumed that Skyline had suffered an injury traceable to the
2    DMHC, but held that any injury was not redressable because alleviating the injury would
3    require action by a "non-party" health insurer "in the form of furnishing [Skyline] with a
4    plan containing the exemption it desires." *Id*. at 15. Although standing was the only
5    jurisdictional issue the DMHC had raised, the Court also held that the case was
6    constitutionally and prudentially unripe because no insurer had specifically asked the
7    DMHC to reconsider its denial of plan language "reflect[ing] [Skyline's] religious
8    beliefs" since the August 2014 letters. *Id*. at 9.

9        The Ninth Circuit reversed, holding that Skyline had standing and that its federal
10    free-exercise claim was justiciable. *Skyline*, 968 F.3d at 754.[4] In so doing, the Ninth
11    Circuit concluded that the DMHC had in fact injured Skyline by requiring its employee
12    healthcare plan to cover elective abortions in violation of the church's beliefs. *Id*. at 747–
13    48. There was "a direct chain of causation from the DMHC's directive . . . to Skyline's
14    losing access to the type of coverage it wanted." *Id*. at 748. The Ninth Circuit also
15    concluded that a favorable court ruling was likely to redress Skyline's injury because a
16    "predictable effect" of such a ruling would be to cause "at least one insurer . . . to sell
17    [Skyline] a plan that accords with its religious beliefs." *Id*. at 750. "The fact that insurers
18    had previously offered plans that were acceptable to Skyline," the court explained, is
19    "strong evidence" that insurers would do so again "if the DMHC were enjoined from
20    enforcing the Coverage Requirement as to any plan purchased by Skyline." *Id*. at 750–51.

21        The Ninth Circuit likewise held that Skyline's federal free-exercise claim was ripe
22    for review. Emphasizing the Abortion Coverage Requirement's "immediate effect" on
23    Skyline, the Ninth Circuit held that Skyline did not "need[] to jump through more hoops
24

25    [4] Because the parties had only briefed the merits of the federal free-exercise claim, the
26    Ninth Circuit vacated the ruling with respect to the other claims and remanded for this
    Court "to reassess the justiciability of Skyline's remaining claims in light of our
27    decision." *Skyline*, 968 F.3d at 753. The Ninth Circuit recognized, however, that certain
    "[a]spects" of its ruling "may apply equally to Skyline's other claims." *Id*. Indeed, those
28    claims are justiciable for the same reasons the federal free-exercise claim is justiciable.

1   before filing this case." *Id*. at 752. Nor should Skyline have to "make further attempts to
2   persuade the DMHC to create an exemption from the Coverage Requirement because the
3   enforcement of that requirement has already caused injury." *Id*. at 753.

4       While Skyline also asked the Ninth Circuit to exercise its discretion and reach the
5   merits of the free-exercise claim, the court declined to do so because the Supreme Court
6   had granted certiorari in *Fulton* after oral argument in this case. *Id.* at 754. Because
7   *Fulton* presented "a legal issue central" to this case, and waiting for a ruling could "hold
8   up the resolution of Skyline's other claims," the Ninth Circuit remanded with instructions
9   for this Court decide in the first instance "the merits of Skyline's claims." *Id*.; *accord*
10  *Foothill Church v. Watanabe*, 3 F.4th 1201 (9th Cir. 2021) (vacating district court's
11  dismissal of a similar lawsuit challenging the Abortion Coverage Requirement, and
12  remanding the case "in light of *Fulton*").

## **ARGUMENT**

**I.   Skyline is entitled to summary judgment on its federal free-exercise claim.**

15      The Supreme Court's recent decision in *Fulton* confirms that Skyline is entitled to
16  summary judgment on its federal free-exercise claim.

### **A.   The Abortion Coverage Requirement triggers strict scrutiny under the Free Exercise Clause because it is not generally applicable.**

19      At a minimum, a law that burdens religious exercise must satisfy strict scrutiny if it
20  is not "neutral" or "generally applicable." *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*,
21  494 U.S. 872, 878–82 (1990). While the Abortion Coverage Requirement fails to meet
22  either standard, it is "more straightforward to resolve this case under the rubric of general
23  applicability." *Fulton*, 141 S. Ct. at 1877. As the Supreme Court recently explained, a law
24  is not generally applicable if it provides "a mechanism for individualized exemptions" or
25  "prohibits religious conduct while permitting secular conduct that undermines the
26  government's asserted interests in a similar way." *Id.* The Abortion Coverage
27  Requirement does both.

28

Plaintiff's Supplemental Memorandum of Points and Authorities

(3:16-cv-00501-LL-MSB)

### 1. The Abortion Coverage Requirement includes a system of individual exemptions.

The Abortion Coverage Requirement is not generally applicable because individualized exemptions are available for "good cause" or if "in the public interest."

In *Fulton*, the Supreme Court reaffirmed that the government may not withhold a religious exemption without compelling reason "where the State has in place a system of individual exemptions." 141 S. Ct. at 1877 (quoting *Smith*, 494 U.S. at 884). There, the City of Philadelphia had refused to contract with Catholic Social Services (CSS) for foster care services unless the organization agreed to certify same-sex couples as foster parents in violation of its beliefs. *Id*. at 1875–76. In so doing, the city invoked the contract's nondiscrimination provision, claiming that it categorically prohibited CSS from declining to certify same-sex couples based on its religious beliefs. *Id*. at 1875. But exceptions from the nondiscrimination provision were in fact available at the city's "sole discretion." *Id*. at 1878. Such discretion, the Court held, created "a system of individual exemptions," making the nondiscrimination policy not generally applicable. *Id*. And it did not matter if the city had ever granted an individualized exemption. The Court explained that the mere "*creation* of a formal mechanism for granting exceptions renders a policy not generally applicable, *regardless* whether any exceptions have been given." *Id*. at 1879 (emphasis added).

The same is true here. Like the foster-care contract in *Fulton*, the Knox-Keene Act creates a "system of individual exemptions" that allows the DMHC to grant exemptions from the Abortion Coverage Requirement for essentially any reason. It does so in at least three separate ways.

*First*, California Health & Safety Code § 1367(i) allows the DMHC to exempt any plan contract or class of plan contracts from the "basic health care services" provision—and thus the Abortion Coverage Requirement—for "good cause." *Second*, § 1343(b) allows the DMHC to exempt "any class of persons or plan contracts" from the entire Knox-Keene Act if such exemption is deemed to be "in the public interest." *Third*, §

10

1344(a) allows the DMHC to waive any requirement of any rule, including the Abortion
Coverage Requirement, if it believes that would be "in the public interest."

Just one of these exemptions overcomes any assertion of general applicability. All
three, considered together, obliterate it. *See, e.g.*, *Smith*, 494 U.S. at 884 ("good cause"
standard "create[s] a mechanism for individualized exemptions"); *Fulton*, 141 S. Ct. at
1877 ("good cause" standard destroys general applicability because it "permit[s] the
government to grant exemptions based on the circumstances underlying each
application"); *GTE Sylvania, Inc. v. Consumers Union of United States, Inc.*, 445 U.S.
375, 384–85 (1980) (phrases such as "in the public interest" and "for good cause" are
"vague" and give agency officials "broad discretion" that is "often abused").

What's more, the DMHC's director has delegated this unbridled exemption
authority to individual staff members within the department's Office of Plan Licensing,
without providing any rules, policies, or procedures for when and how to exercise this
incredibly broad and important power. ECF No. 67-6 at 381–83, Galus Decl., Ex. 4
(DMHC 30(b)(6) Dep.). So individual staff members must "consider the particular
reasons," *Fulton*, 141 S. Ct. at 1877, for any requested exemption and then unilaterally
determine whether those reasons constitute "good cause" or are "in the public interest,"
Cal. Health & Safety Code §§ 1367(i), 1343(b), 1344(a). And, of course, what may be
"good cause" or "in the public interest" for one staff member may not be for another.

In fact, discovery revealed that a staff member within the Office of Plan Licensing
*did* grant an exemption from the Abortion Coverage Requirement, approving a plan in
October 2015 that excluded elective abortions except for rape and incest and to save the
life of the mother. *Skyline*, 968 F.3d at 745. But that plan is "inconsistent with Skyline's
beliefs about abortion," as the Ninth Circuit recognized. *Id*. And exemptions can be (and
have been) awarded for virtually any reason. Yet the DMHC refuses to lift a finger to
accommodate Skyline.

In sum, it is undisputed that the DMHC may grant exemptions from the Abortion
Coverage Requirement for "good cause" or if "in the public interest." Because such a

"mechanism for granting exceptions" necessarily "invites" DMHC officials "to decide which reasons for not complying with the [requirement] are worthy of solicitude," strict scrutiny must apply. *Fulton*, 141 S. Ct. at 1879 (citing *Smith*, 494 U.S. at 884); *accord Dahl v. Bd. of Trustees of W. Mich. Univ.*, 15 F.4th 728 (6th Cir. 2021) (University policy that allowed discretionary exemptions to vaccine requirement for student-athletes was not generally applicable, even though no exemptions were granted).

### 2. There also are categorical exemptions from the Abortion Coverage Requirement.

A law also "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877. One exemption is enough: "government regulations are not neutral and generally applicable . . . whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam). "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.*; *accord Fulton*, 141 S. Ct. at 1877.

Here, the State asserts two interests: (1) ensuring that "all" healthcare plans cover "all 'basic health services,'" and (2) ensuring that healthcare plans do not "discriminate against women or violate their fundamental constitutional rights." Defs.' Mem. of P. & A. in Supp. of Mot. for Summ. J., ECF No. 68-1 at 27. But the Abortion Coverage Requirement is "underinclusive for those ends." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993). While it's true that the State pursues these asserted interests when it comes to Skyline's plan, it does not do so "across-the-board." *Smith*, 494 U.S. at 884.

Besides the individualized exemption authority detailed above, the Knox-Keene Act also includes *categorical* exemptions from its requirements (including the Abortion Coverage Requirement) for secular reasons. For example, healthcare plans operated by higher learning educational institutions need not comply with *any* of the Act's

12

requirements. Cal. Health & Safety Code § 1343(e)(2). Nor must "small plans" that are administered by an employer and have no more than five subscribers. Cal. Code Regs. tit. 28, § 1300.43.

So the State treats some healthcare plans, such as those operated by educational institutions and small employers, more favorably than Skyline's plan. These plans are "comparable" because the "asserted government interest[s] that justif[y]," *Tandon*, 141 S. Ct. at 1296, the Abortion Coverage Requirement—i.e., ensuring *all* healthcare plans cover *all* "basic health services" and ensuring *all* healthcare plans do not "discriminate against women"—apply equally to *all healthcare plans*. To put it another way, the exempted plans are "comparable" to Skyline's plan for the general-applicability analysis because the government's purported interest in ensuring elective abortion coverage applies even when the plan is operated by an educational institution or administered by a small employer. Because exempting those plans "endangers" the State's purported interests to "a similar or greater degree" than would accommodating Skyline's beliefs, strict scrutiny applies for this reason as well. *Lukumi*, 508 U.S. at 543; *see also Tandon*, 141 S. Ct. at 1296–97 (California's COVID gathering restrictions were not generally applicable where three households could not gather for in-home religious services but could gather at hair salons, retail stores, and personal care services because those secular activities did not "pose a lesser risk of transmission" than the in-home religious services).

**B.    The Abortion Coverage Requirement also triggers strict scrutiny because it is not neutral.**

While it is "more straightforward" to decide this case based on the lack of general applicability, *Fulton*, 141 S. Ct. at 1877, strict scrutiny also applies because the Abortion Coverage Requirement is not neutral.

The "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Id.* A lack of neutrality can be "masked, as well as overt," so courts must scrutinize the law or regulation for even "subtle departures from neutrality." *Lukumi*, 508 U.S. at 534. Courts

---

1    therefore must "survey meticulously" the totality of the evidence, analyzing "the
2    historical background of the decision under challenge, the specific series of events
3    leading to the enactment or official policy in question, and the legislative or
4    administrative history, including contemporaneous statements by members of the
5    decisionmaking body." *Id*. at 534, 540. A "slight suspicion" of hostility is enough to
6    trigger strict scrutiny. *Id*. at 547.

7         Skyline's prior summary judgment briefing thoroughly explains why the Abortion
8    Coverage Requirement is not neutral. *See* ECF No. 67-1 at 22–24; ECF No. 84 at 10–12.
9    And Skyline will not repeat those arguments in full here. However, Skyline emphasizes
10   two points.

11        First, it is undisputed that the effect of the Abortion Coverage Requirement in its
12   "real operation," *Lukumi*, 508 U.S. at 535, fell only on religious organizations—
13   something the DMHC knew would be the case *before* issuing the Coverage Requirement
14   in August 2014. Indeed, because of its "investigation" into existing plan documents, the
15   DMHC learned that plans excluding or limiting elective abortion coverage were made
16   available only to religious organizations. ECF No. 67-6 at 287–291, Galus Decl., Ex. 4
17   (DMHC 30(b)(6) Dep.). The DMHC specifically asked the insurers which type of
18   employers had purchased plans restricting abortion coverage, and their answers were loud
19   and clear: only religious organizations. *See* ECF No. 92-2 at 4, Galus Decl., Ex. 38
20   (purchased only by "religious employers"); ECF No. 92-3 at 2, Galus Decl., Ex. 42
21   (same); ECF No. 92 at 2, Galus Decl., Ex. 24 (purchased only by "religious or religious-
22   affiliated organizations").

23        Second, the Abortion Coverage Requirement cannot be deemed completely neutral
24   when the DMHC admittedly issued the mandate in direct response to demands that it
25   prevent *religious* employers from excluding or limiting abortion coverage in their plans.
26   *See supra* pp. 4-7. That is religious targeting, plain and simple. And government action
27   that "target[s] religious beliefs as such is never permissible." *Lukumi*, 508 U.S. at 533.
28

1
2

## C.  The Abortion Coverage Requirement fails strict scrutiny as applied to Skyline Church.

3
4
5

Because the Abortion Coverage Requirement includes a mechanism for individualized exemptions, contains multiple categorical exemptions, and is not neutral towards religion, it must satisfy strict scrutiny under the Free Exercise Clause. It cannot.

6
7
8
9
10
11
12
13
14
15
16

A law or regulation satisfies strict scrutiny "only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Fulton*, 141 S. Ct. at 1881 (quoting *Lukumi*, 508 U.S. at 546). If the State "can achieve its interests in a manner that does not burden religion, it must do so." *Id.* Generalized, or "broadly formulated," interests are insufficient. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 420 (2006). Rather, the State must prove that it has a compelling interest in applying the Abortion Coverage Requirement *to Skyline*—"the particular claimant whose sincere exercise of religion is being substantially burdened." *Id*. The State must therefore establish that it has a compelling interest in denying an exception to Skyline, not that it has a compelling interest in elective abortion coverage generally. *Fulton*, 141 S. Ct. at 1881.

17
18
19
20
21
22
23
24
25
26
27
28

There is simply no interest, let alone a compelling one, in forcing a church to pay for an employee's elective abortion—particularly when all the church's employees are members of the congregation and share the church's beliefs, as is the case here. No court has held as much. To the contrary, the Supreme Court often has held that the government does not have a compelling interest in enforcing a law or regulation that would force a religious institution to violate its religious beliefs or prohibit it from following those beliefs. *E.g.*, *Fulton*, 141 S. Ct. at 1882 (no compelling interest in forcing a faith-based foster-care provider to certify same-sex couples in violation of its religious beliefs); *O Centro*, 546 U.S. at 439 (no compelling interest in barring a religious group's sacramental use of hoasca). So whatever interest the State might have in coverage requirements like this one, it is not strong enough to overcome a church's right to operate according to its beliefs. *See, e.g.*, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,

140 S. Ct. 2367, 2406 (2020) (Ginsburg, J., dissenting) ("exemption granted to houses of worship" from the Affordable Care Act's contraceptive mandate "was justified on First Amendment grounds"); *Pennsylvania v. President United States*, 930 F.3d 543, 570 n.26 (3d Cir. 2019) ("Supreme Court precedent dictates a narrow form of exemption for houses of worship.").

The DMHC hardly contends otherwise. In its summary judgment briefing, the State merely asserts a "compelling governmental interest in ensuring compliance with state law." ECF No. 68-1 at 27. That is precisely the sort of "broadly formulated" interest that fails strict scrutiny. *O Centro*, 546 U.S. at 420. And in any event, the State's interest in complying with its own law cannot trump Skyline's rights under the federal constitution. *See* U.S. Const. art. VI, cl. 2 (Supremacy Clause). Otherwise, every state law that infringed federal constitutional rights would survive strict scrutiny, no matter how burdensome or unnecessary.

Nor is applying the Abortion Coverage Requirement to Skyline narrowly tailored to achieve any purported compelling interest. As explained above, state statutes and regulations already exempt entire categories of plans from the requirement and allow even more exemptions on an individualized basis. This "system of exceptions under the [Act] undermines the [State's] contention that its [coverage requirement] can brook no departures." *Fulton*, 141 S. Ct. at 1882.

## II.   A permanent injunction can issue based on the free-exercise violation alone, eliminating any need to address the remaining claims.

Skyline Church is also entitled to summary judgment on its remaining claims for the reasons set forth in its initial Motion for Summary Judgment. *See* ECF No. 67-1 at 25-34. The DMHC (through the Abortion Coverage Requirement) has unconstitutionally interfered with the church's internal affairs and autonomy, *id.* at 25-27, has violated the Establishment Clause by selectively applying its exemption authority to accommodate only certain religious beliefs, *id.* at 27-28, has violated the California Constitution for the same reasons as under the federal Constitution, *id.* at 29, and has violated California's

APA because the Coverage Requirement conflicts with state and federal law and was issued without notice and comment, *id.* at 31-34.

But the Court need not address these remaining claims. Because Skyline is entitled to summary judgment on its federal free-exercise claim, the Court can—and should—issue a permanent injunction to remedy that constitutional violation, and thus need not reach the merits of the other claims. *See, e.g.*, *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 962 F.2d 1366, 1374 n.10 (9th Cir. 1992) (finding it unnecessary to address the plaintiffs' remaining constitutional challenges to a statute where summary judgment was granted in favor of the plaintiffs on their substantive due process claim). Such an approach would be consistent with the general policy of avoiding unnecessary resolution of constitutional questions. *See Barnes-Wallace v. Boy Scouts of Am.,* No. 00CV1726-J (AJB), 2004 WL 7334946, at *9 (S.D. Cal. Apr. 12, 2004)*, aff'd in part, rev'd in part sub nom. Barnes-Wallace v. City of San Diego,* 704 F.3d 1067 (9th Cir. 2012). It also would be consistent with the policy of avoiding needless adjudication of state law questions in federal court. *See Maryland Cas. Co. v. Knight,* 96 F.3d 1284, 1289 (9th Cir. 1996).

## <u>CONCLUSION</u>

For the foregoing reasons and the reasons set forth in Skyline's prior summary judgment briefing, the Court should: (1) grant summary judgment in favor of Skyline; (2) declare that the Abortion Coverage Requirement violates the Free Exercise Clause as applied to Skyline; (3) permanently enjoin Defendants from enforcing the Abortion Coverage Requirement to prevent Skyline from obtaining a healthcare plan that comports with its religious beliefs; and (4) award nominal damages, costs, and attorney's fees.

1    Dated:  February 2, 2022              Respectfully submitted,

2                                          s/ Jeremiah Galus_____
3                                          Jeremiah Galus (Arizona Bar No. 030469)*
                                           Alliance Defending Freedom
4                                          15100 N. 90th Street
                                           Scottsdale, AZ 85260
5                                          (480) 444-0020
6                                          jgalus@ADFlegal.org

7
                                           Jacob E. Reed (Ohio Bar No. 99020)*
8                                          Alliance Defending Freedom
9                                          44180 Riverside Parkway
                                           Lansdowne, VA 20176
10                                         (571) 707-4718
11                                         jreed@ADFlegal.org

12                                         Charles S. LiMandri (California Bar No. 110841)
13                                         Paul M. Jonna (California Bar No. 265389)
                                           Jeffrey M. Trissell (California Bar No. 292480)
14                                         Freedom of Conscience Defense Fund
15                                         P.O. Box 9520
                                           Rancho Santa Fe, CA 92067
16                                         (858) 759-9948
17                                         cslimandri@limandri.com

18                                         *Admitted *pro hac vice*
19                                         *ATTORNEYS FOR PLAINTIFF*

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on February 2, 2022, service of the foregoing Plaintiff's Supplemental Memorandum of Points and Authorities in Support of its Motion for Summary Judgment was made by way of the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: February 2, 2022                    s/ Jeremiah Galus
                                           Jeremiah Galus
                                           Attorney for Plaintiff